## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| KELLI D. JONES, SHALA J. PEREZ-TRUMBO, and CYNTHIA MARTINEZ, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| WICHITA STATE UNIVERSITY and PAUL DOTSON, individually and in his official capacity as Chief of the Wichita State University Police Department, | ) ) ) ) ) |
| Defendants. | ) ) ) |

CIVIL ACTION

No. 06-2131-KHV

_____

## MEMORANDUM AND ORDER

Cynthia Martinez brings employment claims against Wichita State University ("WSU") and Paul Dotson, Chief of the WSU Police Department.  Specifically, plaintiff claims that WSU committed sexual harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., (Counts I and II) and intentional infliction of emotional distress in violation of Kansas common law (Count V).  Plaintiff alleges that Dotson denied her equal protection under the Fourteenth Amendment in violation of 42 U.S.C. § 1983 (Count IV).[1]  This matter is before the Court on defendants' Motion For Summary Judgment On Claims Of Cynthia Martinez (Doc. #107) filed September 7, 2007.  For reasons set forth below, the Court finds that defendants' motion should be sustained.

_____

[1]        On March 28, 2007, the Court sustained defendants' motion to dismiss plaintiffs' claims against Dotson for sexual harassment, retaliation, intentional infliction of emotional distress and negligent supervision (Counts I, II, V and VI).  The Court also sustained defendants' motion to dismiss plaintiffs' claims that WSU violated Section 1983 (Count III) and engaged in negligent supervision (Count VI).  Memorandum And Order (Doc. #69).

**Legal Standards**

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving parties are entitled to a judgment as a matter of law. See Fed. R. Civ. P. 56(c); accord Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1538-39 (10th Cir. 1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. A "genuine" factual dispute requires more than a mere scintilla of evidence. Id. at 252.

The moving parties bear the initial burden of showing the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hicks v. City of Watonga, 942 F.2d 737, 743 (10th Cir. 1991). Once the moving parties meet their burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which [she] carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated §., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991). The nonmoving party may not rest on her pleadings but must set forth specific facts. Applied Genetics, 912 F.2d at 1241.

The Court must view the record in a light most favorable to the party opposing the motion for summary judgment. Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991). Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative. Anderson, 477 U.S. at 250-51. "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on

suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52.

**Facts**

The following facts are uncontroverted.

In September of 2000, WSU hired Cynthia Martinez to work as a security officer. Since 2004, she has worked as a police officer for the WSU police department. Her duties include patrolling the campus and assisting students, faculty and others as needed. For example, Martinez takes theft and lost article reports, helps with jump-starts, unlocks cars and buildings and escorts individuals to and from buildings. She normally works the second shift.

The WSU police department assigns officers to patrol specified sectors of campus on each shift. Because the campus is relatively small, officers frequently encounter each other as they perform their job duties.[2] The shift supervisor oversees all police resources on the shift, and may also patrol specific sectors of campus. When Dotson became Police Chief, he encouraged supervisors to monitor and observe patrol officers in the field and hold them accountable for their conduct. According to Dotson, it is extremely important for new officers to be supervised more closely than experienced officers.[3]

_____

[2]      The WSU main campus comprises approximately a fourth of a square mile, half of which is a golf course.

[3]      When a new officer completes training with the Kansas Law Enforcement Training Center, the officer is categorized as a "trainee" for two months of field training which includes riding with an experienced officer.

Gary Bequette is a Sergeant with the WSU police department.  From February of 2004 to January 31, 2006 he supervised the second shift.  Occasionally he showed up unannounced when an officer was responding to a call.  Officers on the second shift (both male and female) complained about Bequette's management style and openly expressed their dislike of him.  Second shift officers, including Martinez, had "bitch sessions" in which they complained about Bequette.  Officer Brandon Fox, who thought that Bequette should be fired, wrote a document called "The Bequette Chronicles" which documented his perception of Bequette's failures as a supervisor.  Fox Depo., attached as Ex. B to Defendants' Memorandum Supporting Summary Judgment On Claims of Cynthia Martinez ("Defendants' Memorandum") (Doc. #108) filed September 7, 2007 at 165.

Some time before June 15, 2005, Dotson attended a meeting with Bequette and second shift officers.  Two male officers expressed their opinion that Bequette was following them and looking over their shoulders.  They stated that Bequette was showing favoritism to Martinez by assisting with her calls.  Bequette explained that he assisted Martinez because she was the junior officer on shift.  During this meeting Martinez did not state that any of Bequette's conduct bothered her.

On May 14, 2002, almost two years after she started work for WSU, Martinez and other police officers attended sexual harassment training which was mandatory.  Based on that training, Martinez thought she knew the definition of sexual harassment.  She was also aware of avenues to report it.  On June 15, 2005, all full-time police staff (including Martinez, Bequette and Dotson) attended another training session on WSU sexual harassment policy.

On June 21, 2005, three female police department employees – Martinez, Kelli Jones and Erin Plett – gave Rhonda Cantrell, Associate Director of Employee Relations and Training, written

complaints about the conduct of male co-workers.[4]  Martinez alleged that Bequette invaded her personal space, touched her hand when they passed objects to one another and followed her while she was on duty.  Ex. 19, attached to Martinez Depo. (Doc. #108-3) at 1.  Specifically, Martinez stated that Bequette frequently got within a couple of inches of her and "groped" or "molested" her hand when she passed him documents or pens.  Id.  Plaintiff's complaint did not state how many times Bequette groped or molested her hand.  In her deposition, plaintiff testified that it was less than "every other day."  Bequette never groped or touched any other part of plaintiff's body.  Bequette frequently showed up when plaintiff was performing her job duties, particularly on jump-start or unlock calls.  Bequette followed male officers as well, Martinez Depo., attached as Ex. A to Defendants' Memorandum (Doc. #108) at 102-04, but plaintiff alleges that co-workers noticed Dotson following her more than he followed other officers.  Bequette never made sexually suggestive or inappropriate comments.  Plaintiff complained that when she went to the station to type a report, Bequette would show up to see what she was doing. Male co-workers also complained that Bequette hovered over their shoulders when they prepared reports.

On June 22, 2005, Martinez sent Cantrell the following e-mail concerning her written complaint about Bequette's conduct:

---

[4]      Jones complained that Captain Bruce Johnson had  sexually harassed her (1) in mid-January of 2005 by stating, "Let's face it, you're not an A-cup," and on January 31, 2005, by commenting on plaintiff's clear skin, asking her, "have you ever done anything you know was wrong, but you did it anyway?" then leaning forward and saying, "On top of everything else, you have lips I could kiss for hours."  Ex. 8, attached to Jones Depo. (Doc. #106-3) at 1-3.  Plett wrote that Johnson had made comments to her that "she would look good in blue" when she took a position with a law enforcement agency that wore blue uniforms.  Martinez, Jones and Plett also gave Cantrell a signed document from another co-worker, Susie Ashbridge.  Ashbridge complained that Johnson acted differently when Dotson was around.  Jones, Plett and Ashbridge did not complain about Bequette.

> I think I may have confused you yesterday when I talked about how Bequette follows me around on campus. I don't mind it if he wants to talk to me occasionally – the talking is not the problem. What I do mind and don't like is the following me around all day, always seem to be anywhere I am at, or just happening to show up at my location, whenever that may be. I hope I wasn't confusing anyone when I said he will talk to me about nothing in particular. All I meant is that the talking is not a problem, it is the following me around.

Ex. 20, attached to Martinez Depo. (Doc. #108-3) at KHRC-M 0243.

Martinez talked to fellow officers about Bequette's tendency to follow and invade the personal space of others. Some time in June of 2005, before Martinez filed her complaint, Dotson asked her if Bequette followed her around while she was on shift. Martinez said yes, but did not claim that Bequette engaged in sexual harassment. Before Martinez made her complaint, she never told Bequette, Human Resources or police department upper management that the conduct which she described in her complaint made her uncomfortable.[5]

On June 21, 2005, Cantrell interviewed Martinez, Jones and Plett. Cantrell also contacted Dotson, Ted Ayres, WSU Equal Employment Opportunity Director, and Mike Turner, WSU Director of Human Resources, to tell them about the complaint. On June 22, 2005, Cantrell and Dotson began to investigate. During the next several days, they interviewed Bequette, Heather Ballard, Valerie Pittier, Marie Stahlecker, Susie Asbridge and Joni Butler.[6] Cantrell and Dotson determined that following Martinez was not inconsistent with Bequette's job duties and that nothing about his behavior was sexually inappropriate or harassing. They concluded that Bequette also stood close to male officers. Dotson already knew that male officers on the same shift had complained

---

[5]    Some time during 2004, Martinez talked to Sgt. Ed Catlin about Bequette invading her space, but she does not remember what she told him.

[6]    The parties' fact statements do not identify these individuals.

that Bequette followed them.  In the investigation, Bequette said that he was not aware that he touched Martinez when they exchanged items.  Cantrell and Dotson concluded that nothing suggested inappropriate touching.

On July 5, 2005, Cantrell and Dotson counseled Bequette about Martinez' concerns. They told Bequette that plaintiff's perceptions were important and that he should be aware of what she might perceive as standing or sitting too close, touching her hand for longer than necessary and unnecessarily following her around campus.  Cantrell and Dotson acknowledged, however, that Bequette was responsible for monitoring the performance of his subordinates.

On or about August 23, 2005, Cantrell told Martinez that she and Dotson had spoken to Bequette about her concerns.  Martinez told Cantrell that Bequette had been cool toward her after the report but that their working relationship was fine at that time.  Martinez said that Bequette had not repeated the behaviors of which she had complained.  Cantrell encouraged Martinez to report any further conduct which she thought was inappropriate.

After the complaint of June 21, 2005, plaintiff did not complain to WSU about Bequette invading her personal space, following her or showing up at calls.  In fact, from June 21 to September 23, 2005, Bequette did not act inappropriately toward Martinez.

On September 23, 2005, Martinez reported to Dotson that the day before, when she handed Bequette the telephone, he had clasped his hand and slid his hand over hers as he took the receiver. Martinez and Bequette were seated back to back at the time.  Martinez was not looking at Bequette, and she did not know whether Bequette was looking at her when he reached for the phone.  After Martinez spoke with Dotson, she told Bequette that she did not like it when he touched her hand. Bequette told her that he had "no interest in [her] whatsoever" and that he had accidentally brushed

her hand.  Martinez Depo., attached as Ex. A to <u>Defendants' Memorandum</u> (Doc. #108) at 264.

On September 27, 2005, Dotson and Cantrell met with Bequette and discussed Martinez' concerns about the telephone incident.  Bequette told Dotson and Cantrell that he was not looking at Martinez when he reached back for the telephone and that any touch was accidental.  Dotson and Cantrell reminded Bequette that he needed to be aware of Martinez' concerns about physical contact.  From September 23 to November 10, 2005, Bequette did not engage in any conduct which Martinez perceived as inappropriate.

On November 10, 2005, Bequette was second shift supervisor and Martinez and Cadet Jeremy Housdan reported to him.  The three had been working in separate parking lots, with Bequette and Housdan at a fine arts event and Martinez at a basketball game.  After the outbound traffic, the three headed back to the station.  Bequette made a traffic stop and the other two went to the station.  When Bequette arrived at the station, Martinez and Housdan were there.  Bequette asked police dispatcher, Cassandra Bell, to let him know when Martinez left the station.  He wanted to know when Martinez would be back on duty so he could take his lunch break.

Two days later, Fox told Martinez that on November 10, 2005, Bequette had asked Bell to let him know when Martinez and Housdan were alone at the station together.  Fox told Martinez that he didn't know why Bequette would ask that but said that he thought it made Bequette seem jealous.  Fox's comments upset Martinez because it sounded like Bequette was spying on her.  Martinez directly asked Bell what Bequette had said to her.  Bell told Martinez that she didn't know if Bequette meant for her to tell him whenever Martinez left the building or if it was just for that day.  On November 13, 2005, Martinez confronted Bequette.  Bequette told Martinez that he had made a one-time request so that he would know when Martinez left the station and when he could take

his lunch break.[7]  Bequette said that he had not asked Bell to let him know when Martinez and Housdan were in the station together.

On November 14, 2005, Martinez reported the "spying" incident to Dotson and Captain Sara Morris.  Martinez did not claim that the spying was sexual harassment and Dotson and Morris did not perceive it as such.  Martinez was originally concerned that Bequette had not approached her directly about her whereabouts.  Morris began an inquiry into Bequette's request of November 10.  Morris interviewed numerous witnesses, including Bequette, Bell, Joni Butler (dispatch supervisor) and Mindy Gustus (student dispatcher).  Bell told Morris that Bequette said, "When 600 [Housdan] and Martinez go 10-83 let me know."  She did not understand it to be a continuing request.  Butler told Morris that she had jokingly told Martinez that Bequette was spying on her because he was jealous.  Morris also learned that co-workers had seen Martinez and Housdan spending time together on the job and that co-workers gossiped about their relationship.  At the time, Martinez and Housdan were in fact involved in an intimate relationship but they were trying to keep it a secret from co-workers.  Based on her inquiry, Morris determined that Fox and Bell had gossiped about the incident on November 10, 2005 and had exaggerated and/or distorted it.[8]

On January 5, 2006, Morris met with Martinez and explained that the Department had found

---

[7]  Martinez agrees that there was nothing inappropriate with Bequette asking about the whereabouts of his officers so he could take his lunch break.

[8]  For weeks, rumors had been circulating about the relationship between Housdan and Martinez.  In November of 2005, however, Bequette did not know that Martinez and Housdan were involved in a relationship and did not think that their time together was a problem.  Martinez agrees that whether she was working, as opposed to spending on the clock time with her boyfriend, was a legitimate concern for WSU.  She also agrees that Bequette might have made the request to determine whether she and Housdan were performing their duties.

no wrongdoing by Bequette.  Morris explained that it was not inappropriate for a supervisor to ask to be advised about the whereabouts of his officers.  She also stated that it was not a dispatcher's place to interpret a supervisor's request based on rumors and gossip and discuss the request with other officers, or for officers to gossip about the request.

On January 10, 2006, Martinez sent Morris an email which stated that she was unhappy with the inquiry.  Martinez complained about the length of time it took (about seven weeks), her concern that another officer was assigned to west campus, and her opinion that Bequette might sexually harass other officers.  In the email, Martinez referred to the spying incident as sexual harassment. Morris read the email on January 11, 2006, and discussed it with Martinez the next day.  At that time, Martinez claimed that Bequette had told the dispatcher to use the repeater channel, which meant that his request would not be recorded.  Morris asked Martinez why she had not provided this information in her initial complaint of November 14, 2005, and Martinez said that she did not think to mention it.  Martinez also told Morris for the first time that when Bell told Bequette that Martinez and Housdan were downstairs in the station, Bequette "took off running."  Morris Affidavit, attached as Ex. E to Defendants' Memorandum (Doc. #108) ¶ 11.

Martinez told Morris that she did not think the spying request was sexual, but she nonetheless called Bequette a pervert and a predator.  Based on this information, Morris re-interviewed several witnesses and conducted additional interviews.  Morris learned no information to support Martinez' claims.  Morris ended her inquiry when she received word that Martinez had filed a complaint and that Human Resources would handle the investigation.  Morris did not learn any information which changed her finding that Bequette had committed no wrongdoing.

Because Martinez claimed that Bequette followed her excessively and spied on her, Cantrell

thought that it was important to determine whether Bequette had legitimate concerns about Martinez' use of time.  Cantrell interviewed Martinez' co-workers, who stated that Martinez spent excessive on-duty time with Housdan, that she hid from Bequette to work crossword puzzles and that she was open with other officers about her hiding places.[9]  None of her co-workers said that Martinez had complained about Bequette harassing her.  Cantrell concluded that if Bequette had looked for Martinez while on duty, followed her, or questioned her whereabouts, he was justified in doing so.

On January 24, 2006, Martinez filed an administrative complaint with the Kansas Human Rights Commission ("KHRC") for "physical sexual harassment" from February of 2004 to September of 2005.  Pretrial Order (Doc. #97) filed August 2, 2007, Stipulated Fact No. 12.  When Cantrell received the KHRC complaint, she consulted with Dotson and recommended that Martinez and Bequette be separated while an investigation took place.  After reviewing various options, Dotson determined that the fairest way to handle the situation was to temporarily transfer Martinez. Dotson sent Martinez to the west campus for part of one shift on one day, then temporarily assigned her from the second to the first shift.  Martinez viewed the one-day transfer to the west side as punishment because it was boring.  Other officers, however,  preferred the west side.  Martinez could not name one other officer who viewed work on the west side as punishment.

Dotson based his decision to transfer Martinez rather than Bequette on several factors.  In January of 2006, five sergeant positions were authorized, but only four were filled.  One position

---

[9]       In February of 2005, Fox was disciplined for misusing department time and resources when he wrote and copied non-departmental materials using departmental equipment.  Fox appealed the discipline to a University Grievance Committee.  At the hearing, Martinez testified that she had also misused university time by finding locations on campus where she could hide from her supervisor to take naps or work on crossword puzzles.

was scheduled to work five days a week, eight hours a day, on first shift. Two positions worked the same schedule on the second and third shifts. The fourth position worked four days a week for ten hours a day, and provided supervisory oversight on the second and third shifts when the shift sergeant had days off. The fifth position (relief sergeant) – which supervised first shift patrol officers on Fridays and Saturdays and coordinated prevention programs and special projects on Tuesdays through Thursdays – had been vacant since August of 2005. This position was different and less crucial than the other four positions. The second shift was the busiest patrol shift and Bequette was the only sergeant assigned to supervise officers on that shift. Dotson could not reassign Bequette to the relief position (which was vacant) because that would have left the second shift (which was the busiest) unsupervised five days a week. Based on non-supervisory staff levels for second shift, Dotson concluded that he could temporarily transfer Martinez from second shift (and leave her position open) without undermining the ability of second shift officers to effectively patrol the campus and provide other services.

Dotson wanted to make the assignment as easy as possible for Martinez and he therefore transferred her to first rather than third shift. Third shift runs from 11 p.m. to 7 a.m., and is generally considered the least favored work schedule. A change to third shift would have resulted in a significant change in Martinez' job duties, and Martinez had previously told Morris that she did not want to transfer to third shift. In most departments, including WSU's, first shift is considered the premium patrol shift because it has normal work hours. Martinez acknowledges that Dotson believed that first shift was a desired premium shift. Martinez could think of only one officer who preferred another shift to first shift. Martinez also agreed that first shift employees get the chance for more overtime. Martinez had earned differential pay on second shift, and WSU continued to pay

-12-

her the shift differential while she worked first shift.[10]

Martinez contends that WSU should have transferred Bequette to first shift and let her stay on second shift.  Martinez thought that it was inappropriate for Dotson to even entertain the notion that Bequette had not engaged in sexual harassment.  She believes that it was unfair to transfer her because as someone accused of sex harassment, Bequette had to "prove it didn't happen."[11]  Martinez Depo., attached as Ex. A to <u>Defendants' Memorandum</u> (Doc. # 108) at 139-140.

On January 26, 2006, Dotson informed Martinez of her temporary shift assignment.  That same day, Martinez wrote Dotson a letter which stated that she viewed the reassignment "as a punishment and as retaliation for the sexual harassment complaints that I have filed, both with WSU University and the Kansas Human Rights Commission" and requested to return to her normal work assignment.  Ex. 20, attached to Martinez Depo. (Doc. #108-3) at KHRC-M 0096.  Martinez did not tell Dotson why she opposed the reassignment and viewed it as retaliation.  Dotson returned Martinez to her normal second shift assignment, but not until mid-March.[12]

On February 2, 2006, Martinez filed a second administrative complaint with the KHRC alleging retaliation through her temporary reassignment to first shift.  Before the KHRC completed its investigation, Martinez requested a notice of right to sue which she received on June 20, 2006.

---

[10]     Since nearly all overtime activities are sports events which occur during second shift, the transfer to first shift gave Martinez the opportunity to increase her pay by volunteering for such events on top of her regular schedule.

[11]     Martinez initially testified that during training, Cantrell stated that an alleged harasser was required to prove that he had not engaged in misconduct.  Martinez later acknowledged that a non-lawyer union representative had made that statement.

[12]     In mid-March of 2006, Dotson returned Martinez to second shift and temporarily assigned Bequette to first shift.  Bequette has not supervised Martinez since her temporary reassignment to first shift.

On August 11, 2006, Martinez joined this lawsuit against WSU and Dotson, alleging sexual harassment and retaliation in violation of Title VII, violation of constitutional rights pursuant to 42 U.S.C. § 1983, negligence and intentional infliction of emotional distress. On March 28, 2007, the Court sustained defendants' motion to dismiss plaintiffs' claims against Dotson for sexual harassment, retaliation, intentional infliction of emotional distress and negligent supervision (Counts I, II, V and VI). The Court also sustained defendants' motion to dismiss plaintiffs' claims against WSU for violation of Section 1983 (Count III) and negligent supervision (Count VI). Memorandum And Order (Doc. #69). Plaintiff's remaining claims are for sexual harassment and retaliation in violation of Title VII (Counts I and II against WSU), intentional infliction of emotional distress under Kansas common law (Count V against WSU) and denial of equal protection under Section 1983 (Count IV against Dotson).

WSU and Dotson seek summary judgment on all counts.

## Analysis

WSU asserts that it is entitled to summary judgment on plaintiff's sexual harassment claim under Title VII because as a matter of law (1) plaintiff did not exhaust administrative remedies as to Bequette's spying; (2) the alleged harassment was not based on sex; (3) the alleged harassment was not sufficiently severe or pervasive to constitute a hostile working environment; and (4) WSU has conclusively established the affirmative defense outlined in Faragher v. City of Boca Raton, 524 U.S. 775 (1998). WSU asserts that it is entitled to summary judgment on plaintiff's retaliation claim under Title VII because plaintiff cannot show adverse employment action. WSU claims that it is entitled to summary judgment on plaintiff's outrage claim because (1) it is entitled to Eleventh Amendment immunity and (2) plaintiff cannot show outrageous conduct. Dotson asserts that he is

-14-

entitled to summary judgment because plaintiff cannot establish that he deprived her of a constitutional right and he is therefore entitled to qualified immunity

As a preliminary matter, plaintiff begins the analysis section of her brief by stating that other female employees (including her co-plaintiffs) complained of sexual harassment, and that such evidence "establishes a pattern of retaliatory behavior or tends to discredit the employer's assertion of legitimate motive." Plaintiff Cynthia Martinez' Response To Defendant[s'] Response ("Plaintiff's Response") (Doc. #118) filed October 29, 2007 at 9 (quoting Mendelsohn v. Sprint/United Mgmt. Co., 466 F.3d 1223, 1226-27 (10th Cir. 2006), cert. granted, 127 S.Ct. 2937 (June 11, 2007)). Plaintiff cites no evidence that other female employees complained of sexual harassment by Bequette, however, and the complaints by plaintiff's co-workers do not actually show that it was "far more likely than not that the harassment took place, and that the University made it a habit not to discipline the perpetrators." Id. at 10.

In the sexual harassment context, a plaintiff may introduce evidence of treatment of others if that evidence shows that the conduct created a hostile environment for *plaintiff*. Alwine v. Buzas, No. 02-4185, 2004 WL 363477, at *7 (10th Cir. Feb. 27, 2004) (harassment of co-workers one year after plaintiff's experiences not relevant because plaintiff could not have been aware of such harassment when she alleged she was subject to hostile work environment). Moreover, the undisputed facts include no evidence that Bequette sexually harassed any co-worker, or that anyone else engaged in sexual harassment of plaintiff.

In support of her argument that other female employees experienced sexual harassment, Martinez generally cites the affidavit of Glorimar Calderon. She does not include Calderon's affidavit as an exhibit, however, to her response. Further, the parties' fact statements do not include

any facts which the affidavit purports to substantiate.  <u>See</u> D. Kan. Rule 56.[13]  On November 19,

2007, more than two weeks after Martinez filed her response to defendants' summary judgment

motion, co-plaintiff Jones filed Calderon's affidavit as an untimely exhibit in opposition to

defendants' motion for summary judgment on her claims.  <u>See</u> Doc. #122, Ex. A.  Jones did not file

a motion for leave to file the late affidavit, and Martinez did not file a motion to include the affidavit

as an exhibit.  Neither Jones nor Martinez offer an excuse for the late filing.  Rule 6(d), Fed. R. Civ.

P., provides that "when a motion is supported by affidavit, the affidavit shall be served with the

motion."  Further, D. Kan. Rule 6.1(a) provides in part that "[e]xtensions will not be granted unless

the motion is made before the expiration of the specified time, except upon a showing of excusable

neglect."  To determine whether the movant has demonstrated excusable neglect, the court considers

all relevant circumstances surrounding the party's omission including: (1) the danger of prejudice;

(2) the reasons for the delay including whether it was within the reasonable control of the movant;

(3) the length of delay and its potential impact on judicial proceedings; and (4) whether the party

acted in good faith.  <u>Ice Corp. v. Hamilton Sundstrand Corp.</u>, No. 05-4135, 2007 WL 1732369, at

*1 (D. Kan. June 11, 2007) (citing <u>Bishop v. Corsentino</u>, 371 F.3d 1203, 1206-07 (10th Cir. 2004)

(whether movant has demonstrated excusable neglect rests upon principles of equity)).  Here, neither

---

[13]     D. Kan. Rule 56.1(b)(2)  provides as follows:

> If the party opposing summary judgment relies on any facts not
> contained in movant's memorandum, that party shall set forth each
> additional fact in a separately numbered paragraph, supported by
> references to the record, in the manner required by subsection (a),
> above.    All material facts set forth in this statement of the
> non-moving party shall be deemed admitted for the purpose of
> summary judgment unless specifically controverted by the reply of
> the moving party.

Jones nor Martinez have offered any explanation for the delay or suggested any basis for the Court to determine that she acted in good faith. Therefore the Calderon affidavit is not properly before the Court.

**I.      Sexual Harassment Claim Against WSU (Count I)**

Plaintiff alleges that from February of 2004 through November of 2005, Bequette sexually harassed her by (1) sitting or standing very close to her; (2) fondling her hands when she passed objects to him; (3) following her on work assignments; and (4) on November 10, 2005, asking the dispatcher to tell him when she and Housdan were alone at the station. In the pretrial order, plaintiff also contends that she was exposed to images of a sexual nature and that male co-workers were allowed to sleep on the job, surf the internet and socialize on duty. Pretrial Order (Doc. #97) at 11-12. WSU's motion for summary judgment does not include facts which address these allegations from the pretrial order, and plaintiff's statement of facts does not address these allegations. In its reply, WSU correctly points out that while plaintiff *argues* these allegations, she cites no evidence regarding pornographic movies or other images of a sexual nature, or male co-workers being allowed to sleep, surf the internet and socialize on the job. The Court therefore disregards these allegations of the pretrial order.[14] Plaintiff's sexual harassment claim rests on her allegations that

---

[14]      As the moving party, defendant bears the initial burden of showing the absence of any genuine issue of material facts. Applied Genetics, 912 F.2d at 124. Once defendant meets this burden, the burden shifts to plaintiff as the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters for which she carries the burden of proof. Id. At that point, plaintiff may not rest on her pleadings but must set forth specific facts. Id.; see also Perry v. Woodward, 199 F.3d 1126, 1131 (10th Cir. 1999) (once defendant meets initial burden, plaintiff must go beyond the pleadings and present "evidence sufficient to establish the existence, as a triable issue, of any essential and contested element of her case").

In this case, while plaintiff alleges that pornographic and other sexual images contributed to a hostile work environment, she identifies only one incident where she saw an officer watching

(continued...)

Bequette sexually harassed her by (1) sitting or standing very close to her; (2) fondling her hands when she passed objects to him; (3) following her on work assignments; and (4) on November 10, 2005, asking the dispatcher to tell him when she and Housdan were alone at the station.

WSU asserts that it is entitled to summary judgment on this claim because (1) plaintiff did not exhaust administrative remedies on the spying incident; (2) the alleged harassment was not based on sex; (3) the alleged harassment was not sufficiently severe or pervasive to constitute a hostile working environment; and (4) WSU has conclusively established its Faragher defense.

A.    Exhaustion Of Administrative Remedies Regarding Bequette's Spying

WSU asserts that plaintiff did not exhaust administrative remedies regarding Bequette's spying on November 10, 2005. Exhaustion of administrative remedies is a jurisdictional prerequisite to suit under Title VII. Simms v. Oklahoma, 165 F.3d 1321, 1326 (10th Cir. 1999). To exhaust administrative remedies, a plaintiff generally must present her claim to the EEOC or authorized state agency (in Kansas, the KHRC) and receive a right-to-sue letter based on that charge. Id. at 1326. The charge "shall be in writing and signed and shall be verified," 29 C.F.R. § 1601.9, and must at a minimum identify the parties and "describe generally the action or practices complained of," 29 C.F.R. § 1601.12(b). The charge tells the EEOC or KHRC what to investigate, provides the

---

[14](...continued)

a movie which was "racy" and showed a "sex scene." Martinez Depo., attached as Ex. A to Defendants' Memorandum (Doc. #108) at 106. In regard to the allegation that male co-workers were allowed to sleep on the job, plaintiff first replied that "no one's allowed to sleep on the job," id. at 108, then said that she had heard that other employees saw two male officers sleeping on the job, id. at 108-110. Another male employee, Jay Grayson, told Martinez that he took naps on the job, and plaintiff herself has slept on the job. Id. at 112-13. As to allegations that male co-workers surfed the internet, both male and female co-workers surfed the internet. Also, officers of both sexes talked during duty hours.

Even viewed in a light most favorable to plaintiff, the record reveals no genuine issue of material fact whether these allegations constitute evidence of sexual harassment.

opportunity to conciliate the claim and gives the charged party notice of the alleged violation. See Martinez v. Potter, 347 F.3d 1208, 1211 (10th Cir. 2003). The requirement to present claims in a charge to the EEOC or state agency serves the dual purposes of ensuring the administrative agency has the opportunity to investigate and conciliate the claims and providing notice to the charged party of the claims against it. See id.

Martinez filed her discrimination charge with the KHRC on January 24, 2006, alleging "physical sexual harassment" from February of 2004 to September of 2005. Martinez apparently did not include the spying incident.[15] Defendant asserts that Martinez has therefore failed to exhaust and that the spying incident should not be considered in this lawsuit. Plaintiff responds that her spying claim is reasonably related to her claims of "physical sexual harassment" from February of 2004 through September of 2005.

Consideration of complaints not expressly included in an administrative charge of sexual harassment is appropriate where the conduct alleged would fall within the scope of an EEOC investigation which would reasonably grow out of the charges actually made. Jones v. United Parcel Serv., Inc., 502 F.3d 1176, 1186 (10th Cir. 2007). When an employee seeks judicial relief for conduct not listed in the original charge, the judicial complaint nevertheless may encompass any discrimination "like or reasonably related to the allegations of the EEOC charge." Martinez, 347 F.3d at 1211; see Fox v. Wichita State Univ., 489 F. Supp.2d 1216, 1226 (D. Kan. 2007) (citing Nat'l RR. Passenger Corp. v. Morgan, 536 U.S. 101 (2002) (Supreme Court has abrogated continuing violation theory as to disparate treatment and retaliation claims)). An investigation of

---

[15]     The record does not include the KHRC administrative charge, but the parties have stipulated that Martinez filed her complaint with the KHRC for "physical sexual harassment" that occurred from February of 2004 to September of 2005.

"physical sexual harassment" by Bequette from February of 2004 through September of 2005 would reasonably have led to an investigation of Bequette's "spying" in November of 2005. Plaintiff's EEOC charge contains sufficient allegations to support a Title VII hostile work environment claim based in part on the spying incident of November 10, 2005.

B.    Whether Hostile Work Environment Was Based On Sex

Plaintiff may establish a violation of Title VII by proving that discrimination based on sex created a "hostile or abusive work environment." Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 66 (1986). To establish a prima facie claim for hostile work environment under Title VII, plaintiff must show (1) that she is a member of a protected class; (2) that the conduct in question was unwelcome; (3) that the harassment was based on sex; (4) that the harassment was sufficiently severe or pervasive to create an abusive working environment; and (5) a basis for imputing liability to the employer. Harsco Corp. v. Renner, 475 F.3d 1179, 1186 (10th Cir. 2007); Littton v. Maverick Paper Co., 388 F. Supp.2d 1261, 1284 (D. Kan. 2005). To prevail under a hostile work environment theory, plaintiff must show that sexually-oriented conduct had the purpose or effect of unreasonably interfering with her work performance or created an intimidating, hostile or offensive working environment. Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993), abrogated on other grounds by Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 753 (1998). To establish this claim, plaintiff must show both that the conduct to which she was subjected was "severe or pervasive enough to create . . . an environment that a reasonable person would find hostile or abusive," and that she "subjectively perceive[d] the environment to be abusive." Harris, 510 U.S. at 21. The existence of such an environment can only be determined by looking at the totality of the circumstances present in the workplace, including "the frequency of the discriminatory conduct; its severity; whether it is

physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id.; see also Faragher, 524 U.S. at 787-88.

As noted, plaintiff's sexual harassment claim rests on her allegations that Bequette sexually harassed her by (1) sitting or standing very close to her; (2) fondling her hands when she passed objects to him; (3) following her on work assignments; and (4) on November 10, 2005, asking the dispatcher to tell him when she and Housdan were alone at the station. Defendant argues that plaintiff's claim must fail because the alleged misconduct was not based on plaintiff's sex. To prevail on her claim, plaintiff must show that she was the object of harassment because of her gender. See Penry v. Fed. Home Loan Bank of Topeka, 155 F.3d 1257, 1261 (10th Cir. 1998). Conduct which is overtly sexual may be presumed to be based on gender; actionable conduct is not limited, however, to behavior motivated by sexual desire. See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998). The Supreme Court has set forth three evidentiary routes a plaintiff may utilize to prove that discrimination was based on sex: (1) explicit or implicit proposals of sexual activity motivated by sexual desire, (2) harassment motivated by a general hostility toward members of one gender in the workplace, or (3) comparative evidence about how the defendant treated members of both sexes differently in a mixed-sex workplace. Id. at 80-81. If sufficiently patterned or pervasive, any harassment or other unequal treatment of an employee which would not occur but for the sex of the employee may comprise an illegal condition of employment under Title VII. Hicks v. Gates Rubber Co., 833 F.2d 1406, 1415 (10th Cir. 1987).

In arguing that the alleged harassment was not due to plaintiff's sex, WSU lists specific factual allegations and argues that they are not based on sex. See Defendants' Memorandum (Doc. #108) at 27-31. As an initial matter, even gender-neutral conduct may be relevant to the

Court's determination.  See Chavez v. New Mexico, 397 F.3d 826, 833 (10th Cir. 2005).  In evaluating whether a hostile work environment exists, the Court does not engage in a mechanical analysis which excludes consideration of gender-neutral conduct.  See Penry, 155 F.3d at 1262.  The Court considers the environment as a whole, including gender-neutral conduct, to determine the context in which the alleged harassment occurred.  See Chavez, 397 F.3d at 833; Penry, 155 F.3d at 1262.  When plaintiff produces evidence of both gender-based and gender-neutral harassment and a jury could reasonably view all of the allegedly harassing conduct as the product of sex and gender hostility, the fact finder must determine what inference should be drawn.  See Chavez, 397 F.3d at 833 (citing O'Shea v. Yellow Tech. Servs., Inc., 185 F.3d 1093, 1102 (10th Cir. 1999)).

WSU contends that plaintiff cannot show that Bequette invaded her personal space and followed her because of sex.  Defendant notes that Bequette invaded the personal space of and followed both male and female officers.  Plaintiff acknowledges that both male and female officers complained that Bequette invaded their space and followed them.[16]  She argues, however, that "there is no way to reconcile the complaints of other female employees that alleged that Sergeant Bequette did the same thing to them and invaded their space and made physical contact with them."  Plaintiff's Response (Doc. #118) at 13.  This argument begs the question whether Bequette treated men and women the same with regard to following them and invading their personal space.  Moreover, as noted, plaintiff cites no record evidence that other female employees complained of sexual harassment by Bequette.

Plaintiff has cited no record evidence that Bequette's conduct in following her and invading

---

[16]    Plaintiff claims that Bequette only followed two male employees, but she provides no record support for this statement.

her space was based upon gender.  Also, the record compels the conclusion that the alleged spying incident was simply Bequette's way of determining when Martinez would be back on duty so that he could take a lunch break – a request which Martinez acknowledges was wholly appropriate. Martinez' conjecture that Bequette was "spying" does not raise a genuine issue of material fact as of sexual harassment.

WSU concedes that touching plaintiff's hand could be gender-related, but argues that plaintiff does not allege touching of a sexual nature or sexually suggestive comments when Bequette touched her hand.  See Defendants' Memorandum (Doc. #108) at 14.  The record, however, contains no evidence that Bequette touched the hands of male employees.  If a female employee is physically harassed in a way that male employees are not, the unwelcome touching is presumptively gender-based.  See Morton v. Steven Ford-Mercury, 162 F. Supp.2d 1228, 1241 (D. Kan. 2001).  The Court cannot conclude as a matter of law that Bequette's touching of plaintiff's hand had nothing to do with gender.  See Penry, 155 F.3d at 1263.  Further, although Bequette's invasion of personal space and following were not overtly sexual and were not directed only to plaintiff or to women in general, the Court nevertheless considers them as part of the totality of the circumstances and context for the alleged sexual harassment.

C.    Whether Bequette's Conduct Was Sufficiently Severe Or Pervasive To Constitute A Hostile Working Environment

WSU contends that no reasonable jury could conclude that plaintiff's work atmosphere was sufficiently severe or pervasive to constitute a hostile working environment.  To survive summary judgment, plaintiff must show that a rational jury could find that her workplace was permeated with discriminatory intimidation, ridicule and insult that was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment.  Davis v. U.S. Postal

Serv., 142 F.3d 1334, 1341 (10th Cir. 1998).  The Court determines the existence of such an environment by looking at the totality of the circumstances in the workplace, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Harris, 510 U.S. at 23; see MacKenzie v. City and County of Denver, 414 F.3d 1266, 1280 (10th Cir. 2005).  The Court evaluates these factors from both a subjective and an objective viewpoint.  Harris, 510 U.S. at 21.  The Court considers not only the effect which the discriminatory conduct actually had on plaintiff, but also the impact it would likely have had on a reasonable employee in plaintiff's position.  See Davis, 142 F.3d at 1341.

Construed in a light most favorable to plaintiff, the record supports a finding that because of plaintiff's sex, perhaps twice a week over a 20-month period, Bequette touched plaintiff's hand when she passed objects to him.  Plaintiff characterizes this touching as fondling, grouping or molesting.  In this regard, physical contact does not produce automatic liability under Title VII. McCrackin v. LabOne, Inc., 903 F. Supp. 1430, 1433 (D. Kan. 1995); see Ebert v. Lamar Truck Plaza, 878 F.2d 338, 339 (10th Cir. 1989) (unwelcome touching sparse and not pervasive).  In cases where courts have found physical contact to constitute harassment, the conduct has been more egregious than here.  McCrackin, 903 F. Supp. at 1433 (citing Campbell v. Kansas State Univ., 780 F. Supp. 755, 762 (D. Kan. 1991)) (slapping plaintiff's buttocks "patently abusive"); Ulrich v. K-Mart Corp., 858 F. Supp. 1087, 1091 (D. Kan. 1994) (co-worker repeatedly put his hands on plaintiff's buttocks and legs while making comments, and once grabbed plaintiff, pressed against her, felt breasts and placed hands between legs).  In McCrackin, this Court found that squeezing and rubbing plaintiff's shoulders was not actionable under Title VII.  In this case, evidence that Bequette

"fondled," "groped" or "molested" plaintiff's hand when she passed him things does not create a genuine issue of material fact whether her workplace was permeated with discriminatory intimidation, ridicule or insult which was sufficiently severe to alter the conditions of her employment and create an abusive working environment.

Likewise, the record does not demonstrate a genuine issue of material fact whether Bequette's conduct was sufficiently pervasive to create a hostile work environment. Construed in a light most favorable to plaintiff, the evidence is that over a 20-month period, Bequette "fondled," "groped" or "molested" plaintiff's hand perhaps twice a week when she passed objects to him. In McCrackin, plaintiff cited evidence that over a four-month period a co-worker squeezed and rubbed her shoulders three or four times and her back once – conduct which this Court held "could hardly be said to be pervasive conduct." 903 F. Supp. at 1433. The conduct which plaintiff alleges in this case is more frequent than in McCrackin and many cases have found fewer incidents to be sufficient for a rational jury to find a hostile work environment. See, e.g., Walker v. United Parcel Serv., 76 Fed. Appx. 881, 887 (10th Cir. 2003) (eight incidents over eight-month period sufficiently pervasive to create objectively hostile work environment); Smith v. N.W. Fin. Acceptance Inc., 129 F.3d 1408, 1413-15 (10th Cir. 1997) (six comments over 23-month period sufficient; comments included supervisor, within earshot of plaintiff's co-workers, telling plaintiff to "get a little this weekend" so she would "come back in a better mood"; calling plaintiff a "sad piece of ass"; and telling plaintiff she "would find a decent man if [she] just quit dating Mexicans"); Hurde v. Jobs Plus-Med, 299 F. Supp.2d 1196, 1212 (D. Kan. 2004); cf. Sechrist v. Unified Gov't of Wyandotte County/Kansas City, No. 98-2219, 1999 WL 450947, at *5 (D. Kan. June 22, 1999) (four gender-based incidents, involving at least two individuals over ten-month period, not sufficiently severe or pervasive). In

those cases, however, the conduct was far more severe and often included overtly sexual comments.

Notably, Martinez does not allege that Bequette made sexually inappropriate comments, told off color or gender-related jokes, made reference to her gender or negatively referred to women in general.[17] Harris requires the Court to look at the totality of the circumstances to determine whether plaintiff's working environment was abusive or hostile.  Here, the conduct was not physically threatening or humiliating.  One is hard pressed to understand precisely what plaintiff means when she says that Bequette "fondled," "groped," or "molested" her hand, but it is clear that she means incidental or fleeting contact. She does not allege that Bequette seized or restrained her hand, injured her hand, or applied any force whatsoever.  Plaintiff has cited no evidence that these fleeting contacts interfered with her work performance in any manner whatsoever.  See Harris, 510 U.S. at 23.  An analysis of the factors cited by the Supreme Court leads this Court to conclude as a matter of law that Bequette's actions, while perhaps inappropriate, are not actionable under Title VII.  No reasonable jury would find that Bequette's touching of plaintiff's hand created a workplace that was permeated with discriminatory intimidation, ridicule and insult to plaintiff, or that would constitute sexual harassment from an objective point of view.  WSU therefore is entitled to summary judgment on plaintiff's claim of sexual harassment.[18]

## II.    Retaliation Claim against WSU (Count II)

---

[17]    Plaintiff does not controvert defendants' statements of fact concerning the lack of verbal harassment.  In response to defendants' argument that she has not made out a prima facie case of sexual harassment, however, plaintiff argues that "[i]n this case, plaintiff was subjected to repeated inappropriate remarks which she believed were not only hostile but caused plaintiff to become embarrassed, sick, and nervous."  Plaintiff's Response (Doc. #118) at 14.  As noted, however, plaintiff provides no record evidence to support this claim.

[18]    Because plaintiff cannot establish a prima facie case of sexual harassment, the Court need not address defendant's argument that it has established the affirmative defense set out in Faragher.

In the pretrial order, Martinez asserts that WSU retaliated against her for engaging in protected activity when it (1) transferred her to the west campus for one day and (2) reassigned her to first shift for six weeks while it investigated her sexual harassment complaint.  See Pretrial Order (Doc. #97) at 12.  Title VII makes it unlawful for an employer "to discriminate against any of [its] employees . . . because [the employee] has opposed any practice made an unlawful employment practice."  42 U.S.C. § 2000e-3(a).  In the absence of direct evidence of retaliation, the court assesses claims under the McDonnell Douglas burden-shifting framework.  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973); Medina v. Income Support Div., 413 F.3d 1131, 1135 (10th Cir. 2005).  Under this burden-shifting structure, plaintiff must first establish a prima facie case of retaliation.  If she does so, the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for the adverse employment decision.  From there, the burden returns to plaintiff to show that the stated reason is pretextual.  Trujillo v. Univ. of Colo. Health Sciences Ctr., 157 F.3d 1211, 1215 (10th Cir. 1998).

To establish a prima facie case of retaliation, plaintiff must demonstrate (1) that she engaged in protected opposition to discrimination; (2) that a reasonable employee would have found the challenged action materially adverse; and (3) a causal connection between the protected activity and the materially adverse action.  See Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1202 (10th Cir. 2006) (citing Burlington N. & Santa Fe Ry. Co. v. White, 126 S. Ct. 2405, 2414-15 (2006)).  WSU argues that plaintiff cannot establish the second element – that a reasonable employee would consider either the one-day transfer or the shift reassignment to be a materially adverse action.  Plaintiff responds that there is "little dispute that defendant took an adverse action in that it transferred [her]," but cites no record evidence or case law to support her contention.

As to the one-day transfer to west campus, Martinez may have viewed it as "punishment" because it was "boring," but other officers viewed it as a preferable assignment and Martinez could not name even one other officer who viewed the assignment as punishment.  See White,126 S. Ct. at 2414-15 (employee subjected to conduct that "well might dissuade an objectively reasonable worker from making or supporting a charge of discrimination" suffers adverse action for purposes of Title VII retaliation claim).  The Court finds as a matter of law that the one day transfer to west campus was not adverse.  See Juarez v. Utah, No. 05CV0053, 2006 WL 2623905, at *11 (D. Utah Sept. 11, 2006) (three day transfer to other job site not adverse job action).

As to the six-week temporary reassignment to first shift, WSU points out that the first shift is almost universally highly desired by police officers.  Dotson viewed first shift as more desirable and Martinez identified only one officer – beside herself – who might prefer the third shift.  Further, while Martinez worked the first shift, she continued to receive the second shift pay differential and her job duties remained essentially the same.  Although Martinez objected to the transfer, she gave Dotson no reason why first shift was not a good option for her and the only apparent basis for her objection was that as the alleged harasser, Bequette should have been transferred.

Defendant argues that the reassignment was similar to that in Juarez, where the Court found that a transfer was not an adverse job action.  See 2006 WL 2623905, at *11.  In Juarez, plaintiff alleged sexual harassment by a dentist in the dental practice where she worked.  The dental practice transferred the plaintiff from one clinic to another for three days so that she would not have to work with the dentist.  The court concluded that no reasonable person would find this transfer to be materially adverse because it was for a very short time and it did not affect her job duties, salary or benefits.

Defendant cites <u>McGowan v. City of Eufala</u>, 472 F.3d 736, 742-43 (10th Cir. 2006), in which the Tenth Circuit found that an employer's denial of a request for transfer to the day shift for several months pending the outcome of a lawsuit was not adverse job action.  The Court noted that while plaintiff desired a change in shift, she identified no specific rationale for the transfer.  Here, WSU temporarily moved Martinez to a preferred shift, where her job duties remained the same and she continued to receive the higher pay associated with the less-preferred second shift.  Further, plaintiff had more opportunities to work overtime on first shift.  This is not a case where plaintiff's employee's job duties significantly changed for the worse.  <u>See</u> <u>Semsroth v. City of Wichita</u>, No. 04-1245-MB, 2007 WL 1246223, at *31 (D. Kan. Apr. 27, 2007) (officer reassigned to "banishment beat" which could have negative impact on career advancement and fewer overtime opportunities). As a matter of law, no reasonable jury would find that plaintiff's transfer was materially adverse to her.[19]  WSU is entitled to summary judgment on plaintiff's retaliation claim.

**III.    Intentional Infliction Of Emotional Distress Against WSU (Count V)**

Plaintiff asserts a state law claim against WSU for intentional infliction of emotional distress. Defendant contends that it is entitled to summary judgment because it is immune to claims based on state law and that in the alternative, as a matter of law, Martinez cannot show outrageous conduct or severe distress.

A.    <u>Eleventh Amendment Immunity</u>

---

[19]     The Court finds that even if plaintiff could establish that the transfer to first shift was materially adverse, WSU had legitimate non-discriminatory reasons for its decision – significant staffing and safety reasons which meant that Bequette should remain on second shift.  On this record, any reasonable jury would find that Dotson went out of his way to address staffing and security issues without compromising plaintiff's position.  Martinez' idiosyncratic and unexplained opinions about patrol beats and shift assignments do not create genuine issues of material fact on the question whether defendant had legitimate non-discriminatory reasons for its staffing decisions.

WSU points out that the Court has dismissed plaintiff's negligence claim, holding that as an agency of the State of Kansas, it is immune under the Eleventh Amendment from claims based on state common law.  See Memorandum And Order (Doc. #69) filed March 28, 2007 at 4-5 (dismissing Section 1983 and state law claims against university and Dotson in official capacity based upon Eleventh Amendment immunity).  WSU argues that for the reasons set forth in that Memorandum And Order, it is immune from plaintiff's claim for intentional infliction of emotional distress under Kansas common law.  See, e.g., Garcia v. Lemaster, 439 F.3d 1215, 1219 n.7 (10th Cir. 2006) (Eleventh Amendment provides absolute federal court immunity to state officials for suits alleging breach of contract under state law).

In response, plaintiff argues only that "the misconduct of a coworker is independently actionable in a cause of action for intentional infliction of emotional distress."  Plaintiff's Response (Doc. #118) at 21.  Plaintiff does not address the argument that WSU is entitled to Eleventh Amendment immunity.  Because plaintiff concedes the issue, and based on the analysis set forth in its earlier Memorandum And Order (Doc. #69), the Court finds that WSU is immune from liability on Martinez' state law claim for intentional infliction of emotional distress.[20]

**IV.    Section 1983 Claim Against Dotson (Count IV)**

Plaintiff alleges that Dotson denied her equal protection under the Fourteenth Amendment in violation of Section 1983 (Count IV).  Dotson asserts that he is entitled to qualified immunity on

---

[20]    If the Court had jurisdiction over plaintiff's outrage claim, it would find as a matter of law that the alleged conduct does not rise to the level of intentional, extreme or outrageous conduct and that plaintiff did not suffer extreme and severe emotional distress.  See McGregor v. City of Olathe, Kansas, 158 F. Supp.2d 1225, 1242 (D. Kan. 2001) (citing Fusaro v. First Family Mortgage Corp., 257 Kan. 794, 805, 897 P.2d 123, 131 (1995) (to support tort of outrage, conduct must go beyond bounds of decency and "be regarded as atrocious and utterly intolerable in a civilized society")).

plaintiff's Section 1983 claim because she did not suffer a constitutional injury and he was not deliberately indifferent to her complaints. Plaintiff asserts that a supervisor's complete inaction in the face of known sexual harassment violates the equal protection clause. See Johnson v. Martin, 195 F.3d 1208, 1219-1220 (10th Cir. 1999).

The doctrine of qualified immunity protects government officials from individual liability when they act within the scope of their employment. "Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity provides government officials immunity from suit as well as from liability for their discretionary acts. Mitchell v Forsyth, 472 U.S. 511, 526-27 (1985); Pueblo Neighborhood Health Ctrs., Inc. v. Losavio, 847 F.2d 642, 644 (10th Cir. 1988).

The Supreme Court has established a two-part approach to determine if qualified immunity applies. "The better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged a deprivation of a constitutional right at all. Normally, it is only then that a court should ask whether the right allegedly implicated was clearly established at the time of the events in question." Tonkovich v. Kan. Bd. of Regents, 159 F.3d 504, 516 (10th Cir. 1998) (quoting County of Sacramento v. Lewis, 523 U.S. 833, 842 n.5 (1998)).

Dotson asserts that Martinez cannot establish that he deprived her of a constitutional right, and that he therefore is entitled to qualified immunity.

A.    Deprivation Of Constitutional right

The Tenth Circuit recognizes that sexual harassment under color of state law violates the

-31-

Equal Protection Clause.  See Woodward v. City of Worland, 977 F.2d 1392, 1399 (10th Cir. 1992).

A supervisor's knowledge of sexual harassment and complete inaction in the face of an allegation

may also constitute a constitutional violation.  See Johnson, 195 F.3d at 1219-20.  Martinez does not

allege that Dotson engaged in sexual harassment or knowingly tolerated it.  Rather, she contends that

he completely ignored and failed to investigate her complaints. The undisputed record, however, is

to the contrary.  Dotson was personally involved in immediately responding to each of her

complaints, i.e. the June complaint following the training, the September telephone incident, and the

November spying incident.[21]  Dotson transferred her to first shift while he was investigating her

complaints following her KHRC complaint.  He required all department personnel to attend sexual

harassment training even prior to her complaints.  When Martinez presented her complaint to Human

Resources on June 21, 2005, Dotson coordinated with Human Resources and assisted with the

investigation, interviewing numerous employees.   He interviewed witnesses and, along with

Cantrell, advised Bequette of Martinez' concerns.  When Martinez came forward with the telephone

incident on September 23, 2005, Dotson investigated the incident and again advised Bequette of

Martinez' concerns about inadvertent touching.   When Martinez reported the spying incident,

Dotson made sure that Martinez' complaint was investigated. Plaintiff cannot establish that Dotson

ignored her allegations or violated her constitutional rights.  Dotson therefore is entitled to qualified

immunity on this claim.  See Johnson, 195 F.3d at 1219-20.

---

[21]     The record suggests that the September hand-touching "incident" was accidental.
Further, the spying "incident" was simply a request by Bequette to determine when his subordinates
would be back on duty so that he could take a lunch break – a request which Martinez acknowledges
was wholly appropriate.

**IT IS THEREFORE ORDERED** that defendants' <u>Motion For Summary Judgment On Claims Of Cynthia Martinez</u> (Doc. #107) filed September 7, 2007 be and hereby is **SUSTAINED**.

Dated this 20th day of December, 2007 at Kansas City, Kansas.

<u>s/KathrynH. Vratil</u>
KATHRYN H. VRATIL
United States District Judge