## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| KELLI D. JONES, SHALA J. PEREZ-TRUMBO, and CYNTHIA MARTINEZ, | ) ) ) | |
| **Plaintiffs,** | ) ) | **CIVIL ACTION** |
| **v.** | ) ) | **No. 06-2131-KHV** |
| WICHITA STATE UNIVERSITY and PAUL DOTSON, individually and in his official capacity as Chief of the Wichita State University Police Department, | ) ) ) ) ) | |
| **Defendants.** | ) ) | |

## MEMORANDUM AND ORDER

Shala J. Perez-Trumbo brings employment claims against Wichita State University ("WSU") and Paul Dotson, Chief of the WSU Police Department. Specifically, plaintiff claims that WSU committed sexual harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., (Counts I and II) and intentional infliction of emotional distress in violation of Kansas common law (Count V). Plaintiff alleges that Dotson denied her equal protection under the Fourteenth Amendment in violation of 42 U.S.C. § 1983 (Count IV).[1] This matter is before the Court on defendants' Motion For Summary Judgment On Claims Of Shala J. Perez-Trumbo (Doc. #109) filed September 14, 2007. For reasons set forth below, the Court finds that defendants' motion should be sustained.

---

[1] On March 28, 2007, the Court sustained defendants' motion to dismiss plaintiff's claims against Dotson for sexual harassment, retaliation, intentional infliction of emotional distress and negligent supervision (Counts I, II, V and VI). The Court also sustained defendants' motion to dismiss plaintiff's claims that WSU violated Section 1983 (Count III) and engaged in negligent supervision (Count VI). Memorandum And Order (Doc. #69).

**Legal Standards**

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving parties are entitled to a judgment as a matter of law.  See Fed. R. Civ. P. 56(c); accord Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1538-39 (10th Cir. 1993).  A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law."   Anderson, 477 U.S. at 248.  A "genuine" factual dispute requires more than a mere scintilla of evidence.  Id. at 252.

The moving parties bear the initial burden of showing the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hicks v. City of Watonga, 942 F.2d 737, 743 (10th Cir. 1991).  Once the moving parties meet their burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which [she] carries the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated §., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991).  The nonmoving party may not rest on her pleadings but must set forth specific facts. Applied Genetics, 912 F.2d at 1241.

The Court must view the record in a light most favorable to the party opposing the motion for summary judgment.  Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991).  Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative.  Anderson, 477 U.S. at 250-51.  "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on

-2-

suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988).  Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson, 477 U.S. at 251-52.

### Facts

The following facts are uncontroverted.

Shala Perez-Trumbo worked as a police officer in the WSU police department for five years, from May 22, 2000 to May 23, 2005.  When WSU hired plaintiff, who is of Hispanic ancestry, Sergeant Gary Bequette was her direct supervisor and Charles Rummery was Police Chief.  In June of 2003, Paul Dotson became Chief.

From May 22, 2000 to the present, WSU has continuously maintained anti-harassment policies which prohibit sexual harassment.  Perez-Trumbo participated in sexual harassment training at WSU.[2]

On March 13, 2002, Perez-Trumbo gave Rummery a written report which stated that she had argued with Bequette that morning because he had ignored the fact that she was ill.  Perez-Trumbo

---

[2]     The statements of facts do not include the training dates.

Perez-Trumbo filed charges of discrimination against two other former employers.  On February 10, 1999, she alleged age discrimination against the Bread Lady Bakery.  On September 28, 2000, she alleged sex discrimination and retaliation against Sedgwick County.  She completed the administrative process for filing the 1999 and 2000 charges of discrimination, including submitting signed and notarized charge forms to the KHRC/EEOC.  Perez-Trumbo ultimately filed a lawsuit in the United States District Court for the District of Kansas against Sedgwick County after she received a notice of right to sue.  That lawsuit was ultimately dismissed after Perez-Trumbo failed to timely serve Sedgwick County with the complaint.  Perez-Trumbo assisted co-workers Kelli Jones, Cynthia Martinez and Brendon Fox when they filed administrative charges of discrimination with the KHRC/EEOC.

also stated that Bequette tried to avoid work by asking her and a male officer not to write so many reports.  Finally, Perez-Trumbo stated that on two occasions, Bequette had rubbed himself on her, and that she did not want to provide details of the two incidents until she could discuss it in a private setting.  Ex. 1, attached to <u>Kirkpartick Affidavit</u> (Doc. #110-10) at 12.

On April 5, 2002, Perez-Trumbo gave Anna Kirkpatrick, a WSU Human Resources employee, a document which outlined her complaints about Bequette.  Perez-Trumbo alleged that Bequette touched her inappropriately on two occasions.  First, she alleged that on July 27, 2000, when she was leaning back in a chair with her legs crossed at the ankles and her feet propped up on the dispatch counter, Bequette came in and pressed up against her leg until she moved and sat up.  Bequette did not say anything to her during this incident.  Perez-Trumbo also complained that two years later, in March of 2002, she was holding some paperwork in her hand when Bequette came up and stood against her as he looked at the paper.  She jerked the paper and moved away.

Kirkpatrick investigated Perez-Trumbo's complaints.  Kirkpatrick interviewed Perez-Trumbo, Bequette, Rummery and others.  Perez-Trumbo told Kirkpatrick that Bequette had been stalking her and that she had overheard Bequette make inappropriate comments about Las Vegas.  Although Kirkpatrick asked Perez-Trumbo about the details of those comments, she declined to give Kirkpatrick further information.[3]

On May 8, 2002, Kirkpatrick sent Perez-Trumbo a memorandum about the investigation.

---

[3]       At her deposition, Perez-Trumbo testified that some time after March 13, 2002, she overheard Bequette telling a male officer that he had been to a Las Vegas show with hot women and cold beer, or hot beer and cold women.  Also, he once referred to an overweight female co-worker as "Miss Piggy."  Perez-Trumbo Depo., attached as Ex. A to <u>Defendants' Memorandum Supporting Summary Judgment On Claims Of Shala J. Perez-Trumbo</u> ("<u>Defendants' Memorandum</u>") (Doc. #110) filed September 14, 2007 at 243-45, 520.

Kirkpatrick concluded that the two incidents when Bequette touched Perez-Trumbo were not sexual. Kirkpatrick also stated that the alleged stalking appeared to be consistent with actions of a supervisor who had reason to believe that an employee had performance problems. The memorandum stated that Kirkpatrick had counseled Bequette about effective supervisory techniques and the importance of professional conduct. Perez-Trumbo does not claim that Bequette sexually harassed her after May 8, 2002.

In late summer and fall of 2002, Perez-Trumbo secretly videotaped Bequette performing his job duties. She videotaped from her police vehicle, from inside buildings and from behind walls or other objects, and claims that she was performing her duties while videotaping him. Perez-Trumbo asserts that the videotape shows the type of sexual harassment to which Bequette subjected her. The Court has viewed the entire videotape, which has been converted to a digital video disc. The video includes many scenes of empty streets and building exteriors (presumably on the WSU campus), with occasional views of a police vehicle in an empty parking lot. The video also includes shots of the dash board of a vehicle, and one can hear partially audible talking on a police radio.[4]

In September of 2002, Perez-Trumbo received a written reprimand for making a reference to Bequette's posterior. On November 1, 2002, Chief Rummery issued written discipline to Perez-Trumbo for failure to maintain departmental order, discipline and harmonious relationships with fellow employees. Later in November of 2002, Perez-Trumbo appealed Rummery's discipline to a University Grievance Committee. The committee heard evidence from Rummery, Perez-Trumbo and other witnesses. It concluded that Perez-Trumbo had not demonstrated that Rummery's

---

[4]     How the video reflects sexual harassment is a mystery.

reprimands should be removed from her file.  The committee further found no evidence that the department had subjected Perez-Trumbo to a hostile work environment.

After the committee denied her grievance, Perez-Trumbo met with Roger Lowe, WSU Vice President of Finance and Administration.  Perez-Trumbo told Lowe that she did not want to work with Bequette any longer.  After the meeting, WSU transferred Perez-Trumbo to third shift, so Bequette was no longer her supervisor unless she worked an overtime event where he was a senior officer.

In December of 2002, Perez-Trumbo contacted the Kansas Human Rights Commission ("KHRC") to inquire about making a charge concerning harassment by Bequette and retaliation. The KHRC sent Perez-Trumbo a charge form and instructed her to return the signed and notarized complaint and authorization release form.  Perez-Trumbo received this correspondence, but she never returned it to the KHRC for filing.  Perez-Trumbo does not allege that Bequette engaged in any sexually inappropriate conduct after 2002.

Retaliation Related to Perez-Trumbo's Complaints About Bequette

Perez-Trumbo claims that while Bequette was still her direct supervisor (before December of 2002), he retaliated against her for making a sexual harassment complaint against him. Specifically, Bequette tried to change her days off, denied her equipment and did not give her assignments for which she was qualified.  Plaintiff cites two incidents of retaliation in 2004.  First, in April of 2004, Bequette attempted to remove her from the bicycle patrol.  Second, in July of 2004, Bequette proposed changing her days off because her absenteeism was causing problems in staffing his shift.  See Ex. 40, attached to Perez-Trumbo Depo. (Doc. #110-3).  Sgt. Jerry Galemore told Perez-Trumbo that she needed to announce over the radio whenever she was alone with Sgt.

-6-

Ed Catlin, a male co-worker. Galemore suggested to Perez-Trumbo that if anyone made any slightly inappropriate remark to her, she tended to file a sexual harassment complaint. Perez-Trumbo believed Galemore said this to retaliate for her complaint about Bequette. Galemore did not engage in further retaliatory conduct after February of 2004.

Perez-Trumbo filed other complaints with the police department, including complaints about overtime worked by other officers and use of police equipment by non-police personnel. Perez-Trumbo believes that the foregoing actions against her were in retaliation for her sexual harassment complaint against Bequette as well as her other complaints.

Conflict Between Perez-Trumbo and the Parking Section

WSU police officers have completed the mandated training to become commissioned law enforcement officers. Police officers work in the Patrol Section of the WSU police department. Safety and security officers perform traffic duties but are not commissioned police officers, and they work in the Parking Section.[5] Beginning in 2004, numerous conflicts arose between Perez-Trumbo and the safety officers. On October 26, 2004, Perez-Trumbo sent Dotson a memo which stated that the "working warfare between the parking section and I is a long standing one and has not subsided." Ex. 39, attached to Perez-Trumbo Depo. (Doc. #110-3) at 1. Perez-Trumbo complained that safety officers wore police officer uniforms and rode bicycles which bore the word "Police." Perez-Trumbo complained that safety officer Jones had ridden the bike which Perez-Trumbo also rode and had "messed up" the seat and gears. Perez-Trumbo accused safety officers of removing personal property and blank departmental forms from her bike bag. Perez-Trumbo complained that

---

[5] Various witnesses use the term "Traffic," "Safety" or "Parking" to describe the section of the WSU police department which is staffed by safety and security officers. Since June of 2004, the section has been known as the "Parking Section."

the parking section supervisor allowed safety officers to sign up for overtime before it was posted.

Perez-Trumbo told safety officers Chris Mai and Tyler Richecky that when Parking Section officers used the safety vehicles, the "Police" and "Dial 911" markings, as well as the emergency lights, should be removed. Perez-Trumbo complained about the job titles given to safety officers, and changed the designations in the daily officer assignment book from "TSO" (representing Traffic Safety Officers) to "PSO" (for Parking Safety Officers). Perez-Trumbo suggested that WSU eliminate the Parking Section from the police department. Perez-Trumbo's suggestion to eliminate the Parking Section prompted the section to devote approximately an hour per day logging its duties to justify its existence.

Perez-Trumbo complained to her supervisor and chain of command about Mai and Richecky taking breaks together and going to a Sonic restaurant several miles from campus. Perez-Trumbo also complained about safety officers and other University police officers accepting gratuities.

On October 11, 2004, police officer Garett Moyer detained a motorist, Lined Luna, in the parking lot at a McDonald's next to campus. Moyer told Luna that a week earlier, he had seen her driving erratically. He demanded her driver's license. After Luna produced it, Moyer released her and told her that he would have arrested her if she had not had a valid driver's license.[6] Luna complained about the stop to the department, and Moyer admitted to Dotson that he that knew he had no legal cause or jurisdiction to detain Luna. He admitted that he had detained Luna to harass her because he knew that Luna was in a relationship with Mai. Moyer said that he had stopped Luna to support Perez-Trumbo, who had a previous relationship with Mai.

---

[6] Perez-Trumbo witnessed the Luna traffic stop, arriving on the scene soon after Moyer made the stop.

-8-

Officers Mai and Richecky complained to the department that Perez-Trumbo and Moyer drove by Mai and Richecky at high rates of speed, spinning their tires.

In December of 2004, Perez-Trumbo was disciplined for unauthorized changing of safety officer designations in the duty roster and unauthorized attempts to access a computer used by safety officer Erin Plett.   Perez-Trumbo stated that she wanted to see if the parking section computer worked so it could be placed in the patrol office, in the main police building, for the patrol officers to use.  Perez-Trumbo did not have authority to access the computer.  In the spring of 2005, Perez-Trumbo filed a formal grievance related to that and other discipline.  Due to her schedule, WSU could not complete her grievance before Perez-Trumbo resigned in May of 2005.

Chris Mai

Perez-Trumbo and Mai became friends when Perez-Trumbo helped him file a complaint against Cynthia Martinez and others for releasing his personal information to a student.  As a safety officer, Mai was obligated to follow Perez-Trumbo's orders.  In late 2003, Mai and Perez-Trumbo began an intimate sexual relationship which lasted a month or two.  After it ended, Perez-Trumbo and Mai were friends off and on, but Mai continued to pursue a relationship with her.  In the spring of 2004, Mai went to Perez-Trumbo's house and banged on her door.  During that time, Perez-Trumbo also received hang-up calls at her house.  She believes that Mai made the calls, but she has no evidence that it was him.

Mai provided information for Perez-Trumbo which she used in her proposal to the WSU Suggestion Program to eliminate the parking section.  In April of 2004, Perez-Trumbo and Mai argued about Mai's involvement in the suggestion to eliminate the parking section, and Mai threw a bag of potato chips at Perez-Trumbo.

Some time in the spring of 2004, Mai and Perez-Trumbo planned to take a cruise together later that year.  After the potato chip incident, Mai told Perez-Trumbo that he was not going on the cruise.  Perez-Trumbo hired counsel, who sent Mai a letter demanding that he pay for the cruise. Ultimately, on April 20, 2004, Perez-Trumbo filed a lawsuit against Mai in small claims court for damages associated with the cruise.  Before the case went to trial, Perez-Trumbo and Mai entered a compromise to go on the cruise together and share expenses.  During the summer of 2004, Mai sent Perez-Trumbo text messages which allegedly related to his "dark side," but Perez-Trumbo does not remember any details of the messages.

Some time in August of 2004, dispatcher Mike Colvin told Perez-Trumbo that Mai and Richecky were going to write something "nasty" on a stick figure made to look like Perez-Trumbo. Perez-Trumbo later found a stick figure in the janitor's cart in the women's restroom.  Perez-Trumbo reported the stick figure incident to Dotson and said that she thought it referred to her. Dotson asked Captain John Davis to investigate who had put the stick figure in the women's restroom and its relationship, if any, to Perez-Trumbo.  Davis interviewed numerous witnesses including supervisor Larry Keller, Colvin, Perez-Trumbo, Mai and Richecky.  No one admitted placing the stick figure in the restroom.  Mai acknowledged that he had drawn a face on the stick figure but denied placing it in the women's restroom.  The stick figure had nothing "nasty" written on.  The janitor believed that the stick figure represented her because a feather duster was attached to it.  Perez-Trumbo thought that the stick figure was an effigy of her because it had a "bun" hair style.  The stick figure, however, also had a braid down the back.  Perez-Trumbo says that the stick figure had a stick-on police badge.

Davis could not conclude who had placed the stick figure in the restroom.  He determined

that over a period of time officers (including Perez-Trumbo) had used it to play pranks on fellow officers. Perez-Trumbo acknowledges that she had previously seen the stick figure and that she had been involved in pranks relating to it.

In September of 2004, Perez-Trumbo and Mai went on the cruise which they had litigated in small claims court the previous spring. According to Perez-Trumbo, they negotiated a truce before going on the cruise. They initially had the same state room but got separate rooms after the first night on the cruise.[7] After they returned from the cruise, Perez-Trumbo made audio tapes of several telephone conversations in which she and Mai discussed the cruise and workplace issues. Mai did not know that Perez-Trumbo was taping the telephone calls. Perez-Trumbo asked Mai why he did not comment about how good she looked on the cruise. He told her that she did look nice, and she commented that this meant a lot coming from him. During the conversations, Perez-Trumbo asked Mai if he would visit her if she moved and gave Mai career and life advice.

On October 26, 2004, Perez-Trumbo and Fox prepared a memorandum entitled "Hostile Work Environment." Ex. 39, attached to Perez-Trumbo Depo. (Doc. #110-3). According to Perez-Trumbo, the memorandum addressed the harassment which she had suffered from Mai up to that point. Perez-Trumbo did not provide the memorandum to Dotson or anyone else during her employment. The memorandum stated:

> Chief, I want to file a complaint of a hostile work environment against Chris Mai. As you know the working warfare between the Parking Section and I is a long-standing one and has not subsided. I feel that the recent events surrounding Officer Moyer's suspension directly jeopardizes my ability to perform my job and casts aspersions on the people with whom I associate. Lately, events have become increasing overt and hostile.

---

[7]    While they were on the cruise, Perez-Trumbo tried to ditch Mai and mingle with other people.

Id. at 1.  The memorandum also stated that Mai had "continuously made false and inflammatory charges against anyone he believes I am involved with as well as me personally."  Id.  Perez-Trumbo was referring to Mai's role in the complaint about the Luna traffic stop.  Perez-Trumbo also stated that Mai had falsely reported that she and Officer Corey Herl made fun of Mai over the radio.[8] Id.; Perez-Trumbo Depo., attached as Ex. A to Defendants' Memorandum (Doc. #110) at 405-06. Perez-Trumbo stated that Mai had acted physically aggressive toward officer Moyer in her presence. Perez-Trumbo stated that Mai told her during the September phone calls that he intended to get revenge and retribution against several members of the police department, including her.[9]  Perez-Trumbo complained about the "likeness of [her] that was constructed and placed in the women's restroom."  Ex. 9, attached to Perez-Trumbo Depo. (Doc. #110-3) at 1.  Perez-Trumbo further complained that Mai wrote Moyer a ticket for parking his motorcycle behind the station.

Some time between October 26, 2004 and February 5, 2005, Mai showed up at the same office where Perez-Trumbo had a doctor's appointment.  Mai later presented evidence that he had a dentist's appointment at that office on the same day.  On January 22, 2005, Mai approached Perez-Trumbo after she had received a parking ticket and said, "I heard you got a parking ticket."  Perez-Trumbo considered Mai's comment retaliation for not having a relationship with him.

On February 5, 2005, Mai stared at Perez-Trumbo when they were both working at a WSU basketball game.  That evening or soon after, Perez-Trumbo discussed Mai's staring with Moyer

_____

[8]      Perez-Trumbo agrees that it was possible that Mai believed that she and Herl were making fun of him.

[9]      The recording of the calls includes 70 minutes of conversation involving a wide variety of topics.  It includes statements by Mai to the effect that he would make a splash when he left the department.

and Fox.  At the time, however, she did not report Mai's staring to the senior officer at the game, to Dotson or to the Human Resources department.

On February 16, 2005, Perez-Trumbo asked Fox to go to the WSU basketball game and take statements from individuals with whom she had discussed Mai staring at her at the game on February 5.  On February 16, 2005, Fox was on regular duty and was not assigned to work the basketball game.  Nonetheless, Fox went to the game and asked four individuals to fill out department witness forms about Mai staring at Perez-Trumbo.  Perez-Trumbo had not filed a criminal complaint against Mai, and Fox did not have the authority to obtain witness statements or conduct an investigation.  Catlin noticed that Fox was collecting witness statements at the basketball game, and asked him if he was working a case.  Fox replied that he was collecting statements for Perez-Trumbo.  Catlin suggested that Fox tell Dotson, who was also at the game, what he was doing.  Fox later approached Dotson and gave him the witness statements.  The next day, Dotson contacted Rhonda Cantrell, WSU Director of Employee Relations and Training, to tell her that he had spoken to Fox about some issue between Mai and Perez-Trumbo.

Perez-Trumbo Reports Mai's Conduct

Some time after Fox obtained statements on February 16, 2005, Perez-Trumbo went to the Human Resources Department.  Cantrell was not in the office that day and Perez-Trumbo spoke to her assistant, LaMar Brown.  Perez-Trumbo told Brown that she wanted a sexual harassment complaint form in order to fill out a complaint.  Brown explained that there was no such form and asked Perez-Trumbo who was harassing her.  Perez-Trumbo replied that Mai was stalking her.  Perez-Trumbo told Brown that she had not complained to her supervisor about Mai's conduct.  Perez-Trumbo asked Brown to get a copy of the statements which Fox had collected, and told her

-13-

that Dotson had the statements. Perez-Trumbo told Brown that Dotson had no business taking the statements. Brown suggested that Perez-Trumbo contact Dotson directly about getting a copy of the statements.

The next day, Brown called Perez-Trumbo to set up an appointment with Cantrell and Perez-Trumbo, but Perez-Trumbo refused to schedule an appointment, saying that her lawyer would send Cantrell a letter. Cantrell then tried to contact Perez-Trumbo to determine what sort of complaint Perez-Trumbo wanted to file. When Perez-Trumbo did not respond to her request, Cantrell contacted Dotson and suggested that he contact Perez-Trumbo. Cantrell told Dotson that if there was an issue between Mai and Perez-Trumbo, it should be investigated. Dotson ordered Perez-Trumbo to meet with him in order to determine if sexual harassment was occurring in the department. Perez-Trumbo testified that based on a comment which Fox heard from Catlin about a conversation Catlin had with Dotson, she believes that Dotson and Cantrell were investigating her and Fox. Perez-Trumbo concluded that because Fox thought that he was being investigated, she must be the subject of investigation as well. No one told Perez-Trumbo that she was being investigated for anything.

On February 22, 2005, Perez-Trumbo met with Dotson and Cantrell in Dotson's office. This was the first time that Perez-Trumbo had reported sexual harassment by Mai. Until that time, Dotson was unaware that Perez-Trumbo and Mai had been involved in an intimate relationship. During the conversation, Perez-Trumbo refused to answer questions about her past relationship with Mai. When Dotson asked her if she was complaining about general harassment or sexual harassment, Perez-Trumbo answered "no idea." She told Dotson and Cantrell that Mai had followed

her on campus and called her house, but she did not know the number of times or other details. [10]

After the meeting, Cantrell and Dotson investigated Perez-Trumbo's claims that Mai had stared at and stalked her. They interviewed 17 witnesses, including each witness who had given Fox a witness statement, other police officers who had worked the game, other co-workers and Dr. Rita Goss, a psychologist who had treated Mai. Dotson obtained the duty assignments for the evening and determined where both Mai and Perez-Trumbo were working. Based on the witness statements, Dotson determined where Mai had been standing during the basketball game and that it was within the area to which he was assigned. Dotson and Cantrell measured the arena to determine the distances between where the witnesses were standing and where Perez-Trumbo was standing. Cantrell reviewed additional materials, including the Perez-Trumbo audio recordings of her telephone conversations with Mai. Dotson and Cantrell concluded that Mai was working in his designated area and that his conduct was consistent with his duties as an officer. Perez-Trumbo claims that Dotson exacerbated her hostile work environment by not interviewing one witness whom she had identified.

Discovery and Investigation of "The Snitch"

On March 28, 2005, Perez-Trumbo reported to Catlin (her supervisor) that she had found a copy of the book "The Snitch" on her locker in the women's locker room. Perez-Trumbo claimed that the book included disturbing references to officers who were killed and negative stereotypes about Latinos. She interpreted the book's placement as a direct threat against her. She later

---

[10] Dotson and Cantrell refused to give Perez-Trumbo the witness statements which Fox had collected at the basketball game on February 16, 2005. Perez-Trumbo claims that as a result, she could not seek a protection from abuse order against Mai at that time. Perez-Trumbo later sought and received such an order without the witness statements.

prepared a written memorandum regarding her concerns.  Perez-Trumbo believes that Mai left the

book on her locker but she has no evidence to support this.  Mai later presented evidence that he was

out of the country on the day Perez-Trumbo found the book on her locker.

Soon after the complaint about the book, Dotson conducted an investigation.  He determined

that for months – if not years – before Perez-Trumbo found it on her locker, the book had been at

various locations in the women's locker room.  Dotson interviewed numerous witnesses including

Plett, dispatch supervisor Suzie Asbridge, administrative specialist Heather Ballard, Mai and

housekeeper Paula Ramsey, who corroborated that the book had been in the locker room for some

time before March 28, 2005.  From his investigation, Dotson concluded that the book placement was

not gender-based or race-based harassment or retaliation.

Perez-Trumbo's Funeral Leave Issues

Late on April 20, 2005, Galemore sent Dotson an email which stated that Perez-Trumbo's

grandmother had died and that she had requested six days of leave.  Galemore said, "[p]lease advise

what is required ref. leave request.  She will check her E-mail for details."  Ex. 14, attached to

Dotson Affidavit (Doc. #110-9) at 1.  The next day, Dotson sent Galemore an email asking for more

details about Perez-Trumbo's need for six days of leave.  Dotson explained that she was entitled to

three days of funeral leave, and that he needed more information to determine if she was eligible

for one to three additional days.[11]  On April 22, 2005, Dotson sent Perez-Trumbo an email extending

his condolences for her loss.  Dotson explained that he had asked Galemore to provide additional

information so that he could determine if she qualified for additional leave.  Dotson wrote, "I am

---

[11]      Dotson ordinarily required an officer who asked for more than the standard  three days of funeral leave to provide additional information to determine if circumstances warranted more leave.

-16-

sorry to bother you with these details at a time like this, but your supervisor indicated you will be checking your email concerning these issues." Ex. 15, attached to <u>Dotson Affidavit</u> (Doc. # 110-9) at 1. Dotson listed the details he required to assist her in her leave request. Dotson offered to change her scheduled days off in way that would link her three days of funeral leave with different days off so that she would have leave from 7 a.m. on April 20 to 11 p.m. on April 27, 2005. Dotson told her that this change would create some degree of difficulty for staffing requirements, so he needed her response as soon as possible.

On April 23, 2005 Galemore notified Dotson and Davis that he had previously told Perez-Trumbo that Dotson would have to approve her leave request and that he had instructed Perez-Trumbo to check her email for the answer to her request. At 2:55 p.m. on April 25, 2005, Dotson spoke with Galemore, who had just spoken to Perez-Trumbo by telephone. Galemore understood that Perez-Trumbo was at home. Galemore told her that she only had three days of funeral leave and that Dotson needed to approve her request for an additional three days. Perez-Trumbo told Galemore that someone else had used six days of funeral leave and that she expected the same. Twenty minutes later, Perez-Trumbo called Cantrell. Cantrell then sent Perez-Trumbo an email which attached Dotson's email to Perez-Trumbo dated April 22. In that email, Cantrell cited the police officer-WSU Memorandum Of Agreement, and reinforced that Perez-Trumbo had to speak with Dotson to determine if he would grant additional funeral leave.

On April 25, 2005, Dotson sent an email to Catlin, Perez-Trumbo's supervisor for the third shift that night. Dotson wrote, "I understand she is in Wichita today. My expectation is that she will report for duty at her assigned time tonight, since I have not given her permission to be on funeral leave tonight nor has she responded to me, as requested, concerning my offer to switch her

-17-

days off this week." Ex. 17, attached to <u>Dotson Affidavit</u> (Doc. #110-9) at 1. Catlin later informed

Dotson that Perez-Trumbo did not appear for work and that he had left a voice mail on her home

telephone and cellular telephone informing her she was absent without authority and ordered her

to telephone him.

The next day, April 26, 2005, Dotson emailed Galemore and informed him that Perez-

Trumbo had not contacted him or shown up for work on April 25. At 9:50 p.m. that evening, Perez-

Trumbo called the police station and reported that she would not be at work at 11 p.m., because she

was sick. At 4:53 p.m. the following day, April 27, 2005, Perez-Trumbo sent an email to Galemore

and copied Dotson. She wrote as follows:

> Sgt Galemore: Please note on 26 Ap 05, my physician directed me not to work until
> my re-evaluation on 2 May 05. Regarding my funeral leave, I believe I have
> provided you all information required under my union contract and by Kansas law.
> I politely ask you and Chief Dotson to allow my family and I to grieve without the
> repeated phone calls and e-mails. Although I anticipate being allowed to return to
> work on 3 May 05, I will inform you of my doctor's determination at that time.
> -Officer Perez

Ex. 19, attached to <u>Dotson Affidavit</u> (Doc. #110-9) at 1. On April 28, 2005, Galemore wrote the

following email to Dotson:

> Officer Perez stated that she was also needing the extra time because of caring for
> her Father and his medical problems. I think she referred to takeing (sic) him in for
> Doctors appointments.......HOWEVER, I received a E-Mail from Officer Perez
> April 27th, 2005 1653 hours that now the situation is her medical condition......Now
> it appears she is complaining about receiving E-Mail and phone request for
> information. As I recall I left three messages for Officer Perez to contact you ASAP.
> Officer Perez brags about recording all our conversations. Therefore the recordings
> will show that I was polite and was just trying to get information that she had agreed
> to provide to begin with. I think it is clear Officer Perez has intended to be evasive
> and has provided conflicting information about the use of leave time. Officer Perez
> was given a copy of her leave request and told (CHIEF DOTSON) would have to
> approve her request. She has failed to comply with her instructions.

Ex. 20, attached to <u>Dotson Affidavit</u> (Doc. #110-9) at 1. On May 3, 2005, Dotson received an email

-18-

from Libby Gilbert, Office of Human Resources, stating that Perez-Trumbo's request for FMLA leave for April 26 to May 3, 2005 had been denied.  Dotson did not know that  Perez-Trumbo had applied for FMLA leave for this period.  The message was confusing to Dotson because Perez-Trumbo had previously said that she was on funeral leave through April 25 and that she was too sick to work on April 26.  Further, Dotson's email to her on April 22 would have allowed her to be off work through April 26.

On May 3, 2005, Perez-Trumbo gave Human Resources a doctor's release to return to work The nature of her illness on April 26 and the days that followed for which she apparently also sought FMLA for her father, was unclear to Dotson.  Perez-Trumbo never explained the conflicting leave requests to Dotson and she ignored his numerous requests to contact him.

On May 4, 2005, while she was at work, Galemore instructed Perez-Trumbo to contact Dotson's administrative specialist to schedule a meeting with him.  She did not do so.  The next day, Galemore sent Perez-Trumbo an email which ordered her to contact Dotson's administrative specialist to schedule a meeting.  Two days later, on May 7, 2005, Perez-Trumbo called in sick.  By May 9, 2005, five days after Galemore's initial order, Perez-Trumbo had still not complied with his verbal and written orders to contact Dotson's administrative specialist to schedule a meeting.  Dotson's administrative specialist, Heather Ballard, had no voicemails from Perez-Trumbo and neither Dotson or his staff received telephone calls from Perez-Trumbo in regard to the orders given to her on May 4 and May 5.

On May 9, 2005, Cantrell sought permission to send Perez-Trumbo home at the end of her shift on May 10, 2005, in pay status, pending disciplinary action for insubordination and failure to maintain satisfactory and harmonious relationships in the work place.  Mike Turner, University

Appointing Authority, agreed. Dotson therefore instructed Catlin to order Perez-Trumbo to remain on duty and report to him at 8:30 a.m. on Tuesday, May 10.

Dotson prepared a Notice of Administrative Investigation to give Perez-Trumbo when he met with her on May 10. The notice stated in part

> On April 22nd, I requested that you contact me as soon as possible so that I could assist you in your request. You did not. On April 25th you received multiple requests directing you to contact me. You did not. On April 27th you sent me a copy of an email, in which you not only refused to respond to me as directed, but you requested that your sergeant and I stop performing our required duties, as they related to supervising you and directing you to contact me. . . . On May 4th, you were directed to contact my administrative specialist to schedule a meeting with me. You did not. On May 6th you were again directed to contact my administrative specialist to schedule a meeting with me. You did not. You did not attempt to contact me in person. Nor did you attempt to contact me by telephone. Nor did you attempt to contact me by pager. You did not contact by email.

Ex. 23, attached to Dotson Affidavit (Doc. #110-9) at 1. The notice further stated that Perez-Trumbo was under investigation for failure to maintain satisfactory and harmonious relationships with the public and fellow employees, insubordination and other conduct detrimental to state service.

On May 10, 2005, Catlin informed Dotson that he had ordered Perez-Trumbo to meet with Dotson at 8:30 a.m. She asked Catlin, "I have to stay?" He said yes. Perez-Trumbo replied, "so fire me. I have to be somewhere." Catlin Affidavit, attached as Ex. K to Defendants' Memorandum (Doc. #110) ¶ 12. Catlin heard Perez-Trumbo tell Captain John Davis that she understood she was supposed to remain on duty and meet with Dotson, but that she had to be someplace. Catlin wrote, "He told her that she had better stay as she was told. She indicated that she would not. I again ordered her to stay and she left the building." Id. ¶ 13.

In a report dated May 10, 2005, Davis wrote that Catlin and Sgt. Huckstadt were present

in his office "at about 7:01 hours" when Perez-Trumbo went into his office.  She acknowledged she

had a scheduled meeting with Dotson but she had things to do and would not be there.  He wrote,

> I told her if you were ordered to stay you better be there and keep the meeting. Sgt.
> Catlin said I'm giving you a direct order to stay and make the meeting with Chief.
> Sgt. Catlin said have you contacted Heather Ballard to make an appointment with
> the Chief.  As Officer Perez was walking out of my office I asked her when was she
> going to contact Heather or the Chief for an appointment.  She said when I get time
> I will.

Dotson Affidavit, attached as Ex. F to Defendants' Memorandum (Doc. #110) ¶ 72.

At 4:44 p.m. on May 10, 2005, Perez-Trumbo called the police department dispatcher and

requested sick leave for that evening's duty assignment.  At 6:12 p.m., Dotson sent Perez-Trumbo

an email on her police department account.  Dotson attached a revised Notice of Administrative

Investigation. This notice was similar to the one described above, but also asserted insubordination

as witnessed by Catlin, Huckstadt and Davis.  Dotson prepared a written copy to mail to Perez-

Trumbo at her home address.

At 10:49 p.m. that evening, Perez-Trumbo sent Dotson an email from her police department

account.  It stated,

> Chief Dotson:
>
> I understand you wanted to meet with me at 0830 on 10 May 05 which would have required
> me to work one and one-half hours of involuntary overtime.  However, Sgt. Caitlin [sic] did
> not inform me until 0653, seven minutes before my shift ended.  Unfortunately, I had a
> previous commitment, and was unable to work the extra time.  I respectfully request we
> reschedule and that I be given some advance notice to reschedule my personal commitments.
>
> Officer Perez

Ex. 28, attached to Dotson Affidavit (Doc. # 110-9) at 1.  On May 11, 2005, Perez-Trumbo sent

Dotson an email on her police department account stating she was submitting her resignation based

upon an incident that had occurred on her shift which began May 9, 2005.  She also asked to

reschedule her grievance hearings.  An attachment to her email was dated 10 May 2005 and was titled "letter of resignation."  Ex. 29, attached to <u>Dotson Affidavit</u> (Doc. # 110-9) at 2.

Perez-Trumbo acknowledges that she received the emails addressed to her and that she did not respond to Dotson's requests to meet with him.

The Kansas Law Enforcement Training Central Registry requires Dotson and other executives of law enforcement agencies to report to the Registry the circumstances of an officer's separation from employment.  Dotson filled out the form relating to Perez-Trumbo and checked the box indicating that she had resigned while under investigation.

<u>Perez-Trumbo's Administrative Complaints</u>

On May 31, 2005, Perez-Trumbo filed a charge with the KHRC.  She marked the boxes for retaliation, sex and ancestry discrimination.  The narrative portion of the charge stated that (1) from August of 2004 through May of 2005, plaintiff was sexually harassed by another employee; (2) in December of 2004 she was subjected to a verbal comment regarding her ancestry; (3) on March 28, 2005, she was subjected to harassment regarding her ancestry; (4) in April and May of 2005, she was denied FMLA leave on the basis of sex and race; (5) on May 10, 2005, she was denied back-up when she was performing her police duties; and (6) on May 23, 2005 she was constructively discharged.  Ex. 26, attached to Perez-Trumbo Depo. (Doc. #110-3) at 1.

On July 13, 2005, Perez-Trumbo filed a KHRC charge in which she checked the box for "retaliation" and specifically alleged that "[o]n June 26, 2005, I was informed that my 'Notice of Termination or Status Change' form was marked to indicate I allegedly voluntarily resigned under questionable circumstances."  Perez-Trumbo stated that the filing the form was "an act of retaliation

for having filed a previous discrimination complaint against the respondent."[12]   Perez-Trumbo

identified that complaint as charge number 29164-05W.  Ex. 27, attached to Perez-Trumbo Depo.

(Doc. #110-3) at 1.  The KHRC issued findings of no probable cause on each of her charges.

Perez-Trumbo's Complaint Regarding Central Registry Form

On May 26, 2005, Dotson filled out legally required paperwork for the Kansas Law

Enforcement Training Center Central Registry, in regard to the circumstances of Perez-Trumbo's

resignation.  As the reason for separation, Dotson checked the box for "Voluntary Resignation

(Under Questionable Circumstances) (1): Officer resigned while being investigated or disciplinary

or legal action was being contemplated."  Dotson believed that this box most accurately reflected

the circumstances surrounding the resignation.  On June 28 and again on July 4, 2005, plaintiff

requested that the Kansas Commission on Peace Officers' Standards and Training ("KCPOST")

investigate her claim that WSU had violated the Kansas Law Enforcement Training Act when it

stated that she had voluntarily resigned under questionable circumstances.  On December 13, 2005,

KCPOST determined that plaintiff's complaint was unfounded and closed the matter.

The Perez-Trumbo-Mai Protection Order and Subsequent Hearing

On May 12, 2005, Perez-Trumbo filed a Protection from Abuse / Protection from Stalking

Affidavit in Sedgwick County District Court, Case No. 05-DM-2936.  In the affidavit, Perez-

Trumbo stated:

> I have been the victim of ongoing harassment by Chris Mai.  Mr. Chris Mai
> continues to stalk me during work hours and call my home and cell phone and hang
> up on me.  The most recent occurrence was on 10 May 05 when he showed up on
> a police call I was on, on 05/04/05 when he stood by my car watching me, daily as

---

[12]   Perez-Trumbo estimates that she sent at least 1000 pages of documents to the KHRC in support of her charge.

> I leave work.  He parks his work vehicle along the route I drive to leave work, etc.
> On Feb. 05, 2005 while I was working he stalked me. This was witnessed by 4
> people and two police officers, etc.  Harassment of my coworkers.  Following me
> at work.

Ex. 64, attached to Perez-Trumbo Depo. (Doc. #110-3) at 1.  Based on these allegations,  Perez-

Trumbo received a temporary order of protection.  Her affidavit did not state that Mai was a

co-worker who was responding to orders from his supervisor when he showed up on her police call.

Although Mai admitted no wrongdoing, Perez-Trumbo later agreed to an order regarding his future

contact with her.  Perez-Trumbo moved to Spokane, Washington in July of 2005, but moved back

to Wichita in approximately March of 2006.  After she returned, Mai filed a motion to vacate the

agreed protective order.  Perez-Trumbo resisted, claiming that Mai continued to threaten her.  The

Sedgwick County District Court heard two and a half days of testimony from witnesses including

Perez-Trumbo, Mai, Martinez, Jones, Fox, Dotson, Cantrell, Catlin, Richecky and Moyers.  In the

end, the judge observed that unlike Perez-Trumbo, most people would have let the past stay in the

past.  He also found that the agreed order was serving no useful purpose and vacated it.

On April 8, 2006, Perez-Trumbo and Kelli Jones filed this lawsuit.[13]  They alleged sexual

harassment and retaliation in violation of Title VII, violation of constitutional rights pursuant to 42

U.S.C. § 1983, negligence and intentional infliction of emotional distress.  On March 28, 2007, the

Court  sustained  defendants'  motion  to  dismiss  plaintiffs'  claims  against  Dotson  for  sexual

harassment, retaliation, intentional infliction of emotional distress and negligent supervision (Counts

I, II, V and VI).  The Court also sustained defendants' motion to dismiss plaintiffs' claims against

WSU for violation of Section 1983 (Count III) and negligent supervision (Count VI).  Memorandum

---

[13]     On August 11, 2006, Cynthia Martinez joined the lawsuit.

And Order (Doc. #69).  Plaintiff's remaining claims are for sexual harassment and retaliation in violation of Title VII (Counts I and II against WSU), intentional infliction of emotional distress under Kansas common law (Count V against WSU) and denial of equal protection under Section 1983 (Count IV against Dotson).  WSU and Dotson seek summary judgment on all counts.

## Analysis

WSU asserts that it is entitled to summary judgment on plaintiff's Title VII claims because (1) plaintiff did not exhaust administrative remedies as to sexual harassment by Bequette and retaliation for her sexual harassment complaint of March of 2002; (2) the alleged harassment by Bequette and Mai was not sufficiently severe or pervasive to constitute a hostile working environment; (3) the alleged sexual harassment by Mai was not based on sex; (4) as to alleged sexual harassment by Bequette and Mai, WSU has conclusively established the affirmative defense outlined in Faragher v. City of Boca Raton, 524 U.S. 775 (1998); (5) plaintiff cannot show adverse employment action; and (6) even if plaintiff can show adverse action, WSU has articulated a legitimate good faith reason for the adverse action.  WSU claims that it is entitled to summary judgment on plaintiff's outrage claim because (1) it is entitled to Eleventh Amendment immunity; and (2) plaintiff cannot show outrageous conduct.  Dotson asserts that he is entitled to summary judgment because plaintiff cannot establish that he deprived her of a constitutional right and he is therefore entitled to qualified immunity.

**I.      Sexual Harassment Claims Against WSU (Count I)**

A.      Sexual Harassment by Bequette

Plaintiff alleges that from July of 2000 through April of 2002, Bequette sexually harassed her by (1) invading her personal space on several occasions by rubbing his body against hers;

(2) telling explicit stories about his encounters with strippers and making similar inappropriate sexual comments; (3) and following her for no apparent reason when she was on work assignments. See Pretrial Order (Doc. #97) filed August 2, 2007.  WSU asserts that it is entitled to summary judgment  because plaintiff did not exhaust administrative remedies.

Exhaustion of administrative remedies is a jurisdictional prerequisite to suit under Title VII. Simms v. Oklahoma, 165 F.3d 1321, 1326 (10th Cir. 1999).  To exhaust administrative remedies, a plaintiff generally must present her claim to the EEOC or authorized state agency (in Kansas, the KHRC) and receive a right-to-sue letter based on that charge.  Id. at 1326.  The charge "shall be in writing and signed and shall be verified," 29 C.F.R. § 1601.9, and must at a minimum identify the parties and "describe generally the action or practices complained of," 29 C.F.R. § 1601.12(b).  The charge tells the EEOC or KHRC what to investigate, provides the opportunity to conciliate the claim, and gives the charged party notice of the alleged violation.  Martinez v. Potter, 347 F.3d 1208, 1211 (10th Cir. 2003).  The requirement to present a charge to the EEOC or a state agency as a prerequisite to bringing suit serves the dual purposes of ensuring that the administrative agency has the opportunity to investigate and conciliate the claims and providing notice of the claims to the charged party.  See id.  Filing an untimely charge does not deprive the Court of jurisdiction.  See Zipes v. Trans World Airlines, 455 U.S. 385, 393 (1982).  The timeliness requirement is like a statute of limitations, i.e. subject to waiver, estoppel and equitable tolling.  Id.

In Kansas, plaintiff must file a charge within 300 days of the alleged discriminatory action. See 42 U.S.C. § 2000e-5(e)(1).  Plaintiff alleges that all of the sexual harassment by Bequette took place from July of 2000 through April of 2002.  Plaintiff concedes that she never filed an

administrative charge regarding sexual harassment by Bequette[14] and states that "after reviewing the plaintiff's case, plaintiff abandons [the] sexual harassment claim against Bequette." Plaintiff Shala Perez-Trumbo's Response To Defendants' Motion For Summary Judgment (Doc. #121) filed October 31, 2007 at 14 n.1. WSU is therefore entitled to summary judgment on plaintiff's claim of sexual harassment by Bequette.

B.      Sexual Harassment by Mai

Plaintiff alleges that from April of 2004 through March of 2005, Mai sexually harassed her by (1) throwing a bag of potato chips at her in April of 2004; (2) threatening to expose the fact that they had an intimate relationship which ended in early 2004; (3) placing an effigy of her in the women's restroom; (4) staring at her while they were working a basketball game; (5) following her to training sessions and duty stations; (6) conspiring to harm her professional record by showing that she was under investigation when she resigned; and (7) filing frivolous complaints and helping others file such complaints against her. See Pretrial Order (Doc. #110) at 10. WSU asserts that it is entitled to summary judgment because (1) the alleged harassment was not based on sex (2) the alleged harassment was not severe or pervasive; and (3) WSU has conclusively established the affirmative defense outlined in Faragher.

1.      Whether Hostile Work Environment Was Based On Sex

Plaintiff may establish a violation of Title VII by proving that discrimination based on sex created a "hostile or abusive work environment." Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 66 (1986). To establish a prima facie claim for hostile work environment under Title VII,

---

[14]      In May and July of 2005, plaintiff filed charges with the KHRC but those charges did not refer to sexual harassment by Bequette.

plaintiff must show (1) that she is a member of a protected class; (2) that the conduct in question was unwelcome; (3) that the harassment was based on sex; (4) that the harassment was sufficiently severe or pervasive to create an abusive working environment; and (5) a basis for imputing liability to the employer. Harsco Corp. v. Renner, 475 F.3d 1179, 1186 (10th Cir. 2007); Littton v. Maverick Paper Co., 388 F. Supp.2d 1261, 1284 (D. Kan. 2005). To prevail under a hostile work environment theory, plaintiff must show that sexually-oriented conduct had the purpose or effect of unreasonably interfering with her work performance or created an intimidating, hostile or offensive working environment. Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993), abrogated on other grounds by Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 753 (1998). To establish this claim, plaintiff must show both that the conduct to which she was subjected was "severe or pervasive enough to create . . . an environment that a reasonable person would find hostile or abusive," and that she "subjectively perceive[d] the environment to be abusive." Harris, 510 U.S. at 21. The existence of such an environment can only be determined by looking at the totality of the circumstances present in the workplace, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id.; see also Faragher, 524 U.S. at 487-88.

As noted, plaintiff asserts that Mai sexually harassed her by (1) throwing a bag of potato chips at her in April of 2004; (2) threatening to expose the fact that they had an intimate relationship which ended in early 2004; (3) placing an effigy of her in the women's restroom; (4) staring at her while they were both working a basketball game; (5) following her to training sessions and duty stations; (6) conspiring to harm her professional record by showing that she was under investigation when she resigned; and (7) filing frivolous complaints and helping others file such complaints

against her.  WSU argues that plaintiff's claim fails because the alleged misconduct was not based on her sex.  To prevail on her claim, plaintiff must show that she was the object of harassment because of gender.  See Penry v. Fed. Home Loan Bank of Topeka, 155 F.3d 1257, 1261 (10th Cir. 1998).  Conduct which is overtly sexual may be presumed to be based on gender; actionable conduct is not limited, however, to behavior motivated by sexual desire.  See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998).  The Supreme Court has set forth three evidentiary routes a plaintiff may utilize to prove that discrimination was based on sex: (1) explicit or implicit proposals of sexual activity motivated by sexual desire, (2) harassment motivated by a general hostility toward members of one gender in the workplace or (3) comparative evidence about how the defendant treated members of each sex in a mixed-sex workplace.  Id. at 80-81.  If sufficiently patterned or pervasive, any harassment or other unequal treatment which would not occur but for the sex of the employee may comprise an illegal condition of employment under Title VII.  Hicks v. Gates Rubber Co., 833 F.2d 1406, 1415 (10th Cir. 1987).

In evaluating whether a hostile work environment exists, the Court does not engage in a mechanical analysis which excludes consideration of gender-neutral conduct.  See Penry, 155 F.3d at 1262.  The Court considers the environment as a whole, including gender-neutral conduct, to determine the context in which the alleged harassment occurred.  See Chavez v. New Mexico, 397 F.3d 826, 833 (10th Cir. 2005); Penry, 155 F.3d at 1262.  Though all conduct is relevant to determine context, only conduct which occurred because of plaintiff's gender can be a basis for liability under Title VII.  See Penry, 155 F.3d at 1262.  When plaintiff produces evidence of both gender-based and gender-neutral harassment and a jury could reasonably view all of the allegedly harassing conduct as the product of sex and gender hostility, the fact finder must determine what

inference should be drawn.  See Chavez, 397 F.3d at 833 (citing O'Shea v. Yellow Tech. Servs., Inc., 185 F.3d 1093, 1102 (10th Cir. 1999)).

WSU acknowledges that on the surface, Mai's conduct might be viewed as gender-related because he and plaintiff were involved in an intimate relationship from December of 2003 through early 2004.  The conduct which plaintiff complains of occurred, however, after the relationship ended.  Most of the incidents of which plaintiff complains – the potato chip bag, the stick figure, Mai's alleged false reports and conspiring with others to harm plaintiff's professional record – are gender-neutral.  In her complaint to the department, plaintiff characterized these incidents as part of the "warfare" between plaintiff and the traffic department.  The staring and stalking conduct, as well as Mai's threats to disclose their former relationship, are arguably gender-related.  Courts have found, however, that inappropriate conduct after termination of a relationship may result from personal animosity, rather than unlawful gender bias.  See Succar v. Dade County Sch. Bd., 229 F.3d 1343, 1345 (11th Cir. 2000) (personal animosity not equivalent of sex discrimination; plaintiff cannot turn personal feud into sex discrimination case).  The analysis focuses only on whether the complaining employee was targeted because of gender.  See Oncale, 523 U.S. at 80.  Mai's misconduct toward plaintiff appears to be because of her intimate role in Mai's prior life rather than because of plaintiff's gender.  Succar, 229 F.3d at 1345 (citing Keppler v. Hinsdale Twp. High Sch. Dist. 86, 715 F. Supp. 862, 869 (N.D. Ill. 1989)).  In other words, plaintiff's gender was not the impetus for Mai's conduct; it was merely coincidental.

Mai and Perez-Trumbo were involved in a tumultuous personal relationship which spawned not only this litigation but also litigation about the cruise vacation, a protective order and a slander case against Mai's therapist.  Their personal animosity undermines plaintiff's argument that Mai's

-30-

conduct constitutes gender discrimination. Much of Mai's conduct related to workplace conflicts between plaintiff and the parking section, which had nothing to do with her gender. The argument which led to the first alleged act of sexual harassment by Mai – the potato chip incident—concerned Perez-Trumbo's suggestion to eliminate the department where Mai was working, and appears to have had nothing to do with her gender or even their failed relationship. See McCrackin v. LabOne, Inc., 903 F. Supp. 1430, 1433 (D. Kan. 1995) (supervisor throwing bag of candy clearly not harassment based on plaintiff's sex). Perez-Trumbo did draft a complaint – which she never submitted – alleging that Mai was creating a hostile work environment. Her concerns specifically related to her "warfare" with the parking section, however, and the document did not mention gender or sex discrimination or harassment. Indeed, her allegations were against not only Mai, but Richecky. Furthermore, plaintiff complained not just about Mai's conduct toward her, but Mai's conduct toward male co-workers (Moyer and Herl).

Taken as a whole, the conduct of which plaintiff complains is similar to conduct which courts have regarded as not based on sex. See Succar, 229 F.3d at 1345; see also Sechrist v. Unified Gov't of Wyandotte County/Kansas City, Kan., No. 98-2219-KHV, 1999 WL 450947, at *5 (D. Kan. June 22, 1999). The Court therefore finds that WSU is entitled to summary judgment on plaintiff's claim that Mai sexually harassed her.[15]

---

[15]    Because the Court finds that the alleged harassment by Mai was not based on sex, it does not address defendant's Faragher defense. Even if it were to find that the alleged harassment were based on sex, it would find as a matter of law that the harassment was not so severe or pervasive as to constitute a hostile work environment. To survive summary judgment, plaintiff must show that a rational jury could find that her workplace was permeated with discriminatory intimidation, ridicule and insult that was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment. Davis v. U.S. Postal Serv., 142 F.3d 1334, 1341 (10th Cir. 1998). The Court evaluates these factors from both a subjective and an
(continued...)

II.     Retaliation Claims against WSU (Count II)

Perez-Trumbo asserts two claims of retaliation.  First, she alleges that Bequette and others retaliated for her complaint in March of 2002 that Bequette sexually harassed her when he (1) changed her schedule in January of 2003; (2) removed her from bicycle patrol in April of 2004; (3) tried to change her schedule in July of 2004; (4) together with other supervisors, "constantly threatened to reprimand or terminate her if she made more complaints;" (5) unnecessarily criticized plaintiff in front of her co-workers which damaged her relationship with co-workers; (6) watched plaintiff "with a "higher level of scrutiny" than other officers; (7) denied plaintiff police assignments for which she was qualified; (8) denied plaintiff assignment to bike patrol and did not provide her proper equipment .  See Pretrial Order (Doc. #97) at 8-9.[16]  Second, plaintiff alleges that in

---

[15](...continued)
objective viewpoint – considering not only the effect which the discriminatory conduct actually had on plaintiff, but also the impact it would likely have had on a reasonable employee in plaintiff's position.  See Davis, 142 F.3d at 1341.

Here, plaintiff claims that Mai  sexually harassed her by throwing a bag of potato chips at her, threatening to expose the fact that they had an intimate relationship, making false reports about her and following her and staring at her while they were on duty.  Even if true, these facts must be viewed by looking at the totality of the circumstances.  In that regard, the record conclusively demonstrates that plaintiff was ultra-sensitive to any possible or perceived, or even imaginary slight in the workplace.  She made so many complaints to so many agencies that the Court cannot begin to set them forth here.  As a matter of law, no reasonable employee would have perceived Mai's conduct as severe or pervasive, and no reasonable jury would find for plaintiff on her sexual harassment claim.

[16]     The paragraph of the pretrial order which sets out plaintiff's claims of retaliation by Bequette also sets out her claim of sexual harassment by Mai, as detailed in the Court's analysis above, and her claim that Dotson retaliated for her complaints of harassment by submitting a Central Registry form which stated that plaintiff resigned under questionable circumstances while being investigated or while disciplinary or legal action was being contemplated.  Pretrial Order (Doc. # 97) at 11.  It is unclear from the pretrial order whether plaintiff asserts that Mai sexually harassed her in retaliation for her complaint of sexual harassment.  In her response to defendants' motion for summary judgment, plaintiff states as follows:

(continued...)

retaliation for her complaints of harassment, Dotson submitted to the KLETC Central Registry a form stating that she had resigned "under questionable circumstances" while being investigated or disciplinary or legal action was being contemplated.  Id. at 11.

WSU asserts that it is entitled to summary judgment on plaintiff's sexual harassment claim because (1) plaintiff did not exhaust administrative remedies on the claim that Bequette and others retaliated against her, (2) the form which Dotson filed with the Central Registry is not materially adverse and (3) even if plaintiff can establish a prima facie case, she can not rebut defendant's good faith reason for submitting the form.

A.    Retaliation For Bequette Complaint

WSU asserts that plaintiff did not exhaust administrative remedies regarding retaliation for her complaint in March of 2002.  As noted, exhaustion of administrative remedies is a jurisdictional prerequisite to suit under Title VII.  Simms, 165 F.3d at 1326.

On May 31, 2005, when Perez-Trumbo filed a charge with the KHRC, she marked the boxes for retaliation, sex and ancestry discrimination.  The narrative portion of the charge alleged that (1) from August of 2004 through May of 2005, plaintiff was sexually harassed by another employee; (2) in December of 2004 she was subjected to a verbal comment regarding her ancestry; (3) on

---

[16](...continued)
[P]laintiff will be abandoning any claims of sexual harassment by Bequette from 2000 to 2002.  The plaintiff will maintain her claims based on a retaliatory hostile work environment by Bequette and others related to the Bequette sex harassment complaints, which primarily occurred in 2002, with two discrete actions in 2004. The plaintiff will also maintain her sexual harassment claims against Chris Mai. Finally, plaintiff will maintain her claim of retaliation by Dotson for his reporting to the Central Registry in 2005.

Plaintiff's Response (Doc. #121) at 16.  Based on plaintiff's response, it appears that plaintiff does not assert that Mai retaliated against her for protected conduct.

March 28, 2005, she was subjected to harassment regarding her ancestry; (4) in April and May of 2005, she was denied FMLA leave on the basis of sex and race; (5) on May 10, 2005, she was denied back-up when she was performing her police duties; and (6) on May 23, 2005 she was constructively discharged.  On July 13, 2005, plaintiff filed a KHRC charge in which she checked the box for "retaliation" and alleged that in retaliation for filing a discrimination complaint against WSU, it accused her of resigning under questionable circumstances.

WSU notes plaintiff's claim that beginning in March of 2002, Bequette and others created a retaliatory hostile work environment.  Perez-Trumbo acknowledges that this harassment ended for the most part when Bequette was removed as her supervisor in late 2002.  She alleges that Bequette retaliated against her, however, in April of 2004 when he tried to remove her from the bike patrol and on July 14, 2004, when he tried to change her schedule.  WSU points out that neither administrative charge alleges any retaliatory conduct related to Bequette.  WSU argues that her charge was untimely because the last incident of retaliation which related to Bequette occurred on July 14, 2004, more than 300 days before plaintiff filed her administrative charge.  See Annett v. Univ. of Kan., 371 F.3d 1233, 1238 (10th Cir. 2004) (each discrete retaliatory action constitutes separate unlawful employment practice for which administrative remedies must be exhausted).  Plaintiff asserts that retaliation claim which involves Bequette is "reasonably related" to allegations in her two charges, and that she therefore has exhausted that claim.  Metzger v. City of Leawood, 144 F. Supp.2d 1225, 1247 (D. Kan. 2001).  Plaintiff does not respond to defendant's argument that her complaint was untimely.  Plaintiff's charge is untimely, and plaintiff does not argue the time limit should be tolled.  Plaintiff's claim that Bequette and others retaliated against her for her complaint of March, 2002 by creating a hostile work environment is time-barred.  WSU is therefore

entitled to summary judgment on this claim.

B.    Retaliation By Dotson

Title VII makes it unlawful for an employer "to discriminate against any of [its] employees . . . because [the employee] has opposed any practice made an unlawful employment practice."  42 U.S.C. § 2000e-3(a).  In the absence of direct evidence of retaliation, the court assesses claims under the McDonnell Douglas burden-shifting framework.  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973); Medina v. Income Support Div., 413 F.3d 1131, 1135 (10th Cir. 2005).  Under this burden-shifting structure, plaintiff must first establish a prima facie case of retaliation.  If she does so, the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for the adverse employment decision.  From there, the burden returns to plaintiff to show that the stated reason is pretextual.  Trujillo v. Univ. of Colo. Health Sciences Ctr., 157 F.3d 1211, 1215 (10th Cir. 1998).

1.    Adverse Employment Action

To establish a prima facie case of retaliation, plaintiff must demonstrate (1) that she engaged in protected opposition to discrimination; (2) that a reasonable employee would have found the challenged action materially adverse; and (3) a causal connection between the protected activity and the materially adverse action.  See Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1202 (10th Cir. 2006) (citing Burlington N. & Santa Fe Ry. Co. v. White, 126 S. Ct. 2405, 2414-15 (2006)).  WSU argues that plaintiff cannot establish a prima facie case of retaliation because she cannot establish that she suffered a materially adverse action.  In response, plaintiff cites no authority that Dotson's action in completing the Central Registry form was materially adverse.  Rather, plaintiff argues that "there is little dispute that defendant took adverse action" when it filed

-35-

a Central Registry form which indicated that plaintiff had resigned under questionable circumstances, i.e. while under investigation.  Plaintiff's Response (Doc. #131) at 21.

For purposes of a Title VII retaliation claim, an action is materially adverse if it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington, 126 S. Ct. at 2415 (further quotation omitted).  In Burlington the Supreme Court explained the standard: "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 2415 (citations and quotation marks omitted).  The Court stated that "we speak of material adversity because we believe it is important to separate significant from trivial harms."  Id.  The purpose of Title VII's anti-retaliation provisions is to prohibit "employer actions that are likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers," and "normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence."  Id. (citation and internal quotation marks omitted).  The Supreme Court purposely phrased the standard in general terms "because the significance of any given act of retaliation will often depend on the particular circumstances."  Id.  For example, a "supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight.  But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination."  Id. (citing 2 EEOC 1998 Manual § 8, p 8-14).  Applying these standards, the Supreme Court concluded that a jury could find that assigning plaintiff to less-desirable job duties and suspending her without pay (even though later reinstating her with backpay) amounted to materially adverse acts in retaliation

-36-

for filing the EEOC complaint.  Id. at 2417.

Under Burlington, Dotson's submission of a Central Registry form which stated that plaintiff resigned under questionable circumstances while being investigated or disciplinary or legal action was being contemplated could be materially adverse.  See Halfacre v. Home Depot, U.S.A., Inc., 221 Fed. Appx. 424, 432 (6th Cir. 2007) (performance evaluation that is significantly lower than previous evaluations and which employee believes was unjustified constitutes materially adverse action); Caprio v. Mineta, No. CIVA 04-5805, 2007 WL 2885815, at *9 (D.N.J.  Sept. 27, 2007) (materially adverse action where employer interfered with training and registration schedules and procedures with no justification, denied standard vacation and leave requests and did not promptly sign papers for plaintiff to apply for vacancies or promotion).[17]  The Court in Burlington stated that retaliation is not limited to discriminatory actions that affect the terms and conditions of employment because an employer could effectively retaliate against an employee by taking actions not directly related to his employment or by causing him harm outside the workplace.  In this case, Dotson's statement on the Registry Form could harm plaintiff by impeding her efforts to obtain another law enforcement position.  Persichitte v. Bd. Of Trustees of Univ. of N. Colo., No. 05-cv-01508, 2007 WL 218781, *8 (D. Colo. Jan. 26, 2007) (sending new employer email accusing plaintiff of federal grant mismanagement and discussing initiation of ethics inquiry materially adverse under Burlington); Burns v. Borough of Glassboro, No. 05-3034, 2007 WL 1672683, at *9 (D.N.J. June 11, 2007) (action which deprived plaintiff of future employment opportunities is materially adverse). WSU is not entitled to summary judgment on this issue.

2.      Pretext

---

[17]      WSU does not argue that plaintiff has not established the other elements of a prima facie case.

WSU argues that it had a legitimate non-discriminatory reason for the challenged action. Specifically WSU asserts that Dotson in good faith believed that Perez-Trumbo was under investigation when she resigned.  Dotson testified that he believed he filled out the registry form appropriately, and WSU notes that when plaintiff challenged his conduct, an independent agency investigated and found no wrongdoing.  The Court therefore finds that WSU has met its burden of articulating a legitimate non-discriminatory reason.  The burden therefore shifts to plaintiff to show that the articulated reason is a pretext for retaliation.

WSU contends that plaintiff cannot show that its stated reason for the challenged action – that Dotson believed he filled out the Central Registry form properly – was a pretext for discrimination.  Plaintiff can show pretext by pointing to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence."  Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir.1997) (quotations omitted).  While "[t]his burden is not onerous . . . it is also not empty or perfunctory."  Id. at 1323-24.  A plaintiff typically makes a showing of pretext in one of three ways: (1) evidence that defendant's stated reason for the adverse employment action was false, i.e. unworthy of belief; (2) evidence that defendant acted contrary to a written company policy prescribing the action to be taken under the circumstances; or (3) evidence that defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting plaintiff.  Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1230 (10th Cir. 2000).

In response to WSU's proffered reason, plaintiff argues that despite e-mails and phone messages from WSU officials which asked her to clarify her requests for funeral and then sick leave,

she had "no idea" that she was under investigation when she resigned. Plaintiff points out that the record contains no evidence that she received the e-mails and phone calls concerning her leave requests and no notice that the department was investigating her conduct. Plaintiff sent her resignation to Dotson on the departmental e-mail, however, and she cites no evidence that she did not receive the e-mails and phone messages. Perez-Trumbo asserts that "the implication that she resigned under investigation implies that she was at least given notice that she was being investigated, and notice of what she was being investigated for." The Court disagrees. Even if plaintiff did not know that she was under investigation, that fact does not create a genuine issue of material fact concerning Dotson's reason for filing out the registry form as he did.

Plaintiff has not met her burden to show Dotson's stated reasons are a pretext for discrimination. No reasonable jury could find that WSU retaliated against plaintiff for complaints of discrimination by stating that she resigned under questionable circumstances. WSU is therefore entitled to summary judgment on her retaliation claim.

## III.     Intentional Infliction Of Emotional Distress Against WSU (Count V)

Plaintiff asserts a state law claim against WSU for intentional infliction of emotional distress. Defendant contends that it is entitled to summary judgment because it is immune to claims based on state law and that in the alternative, as a matter of law, Perez-Trumbo cannot show outrageous conduct or severe distress.

### A.     Eleventh Amendment Immunity

WSU points out that the Court has dismissed plaintiff's negligence claim, holding that as an agency of the State of Kansas, it is immune under the Eleventh Amendment from claims based on state common law. See Memorandum And Order (Doc. #69) at 4-5 (dismissing Section 1983 and

state law claims against university and Dotson in official capacity based upon Eleventh Amendment immunity). WSU argues that for the reasons set forth in the Memorandum and Order, it is immune from plaintiff's claim for intentional infliction of emotional distress because it is based upon Kansas common law. See, e.g., Garcia v. Lemaster, 439 F.3d 1215, 1219 (10th Cir. 2006) (Eleventh Amendment provides absolute federal court immunity to state officials for suits alleging breach of contract under state law). Plaintiff does not address the argument that WSU is entitled to Eleventh Amendment immunity. Because plaintiff has conceded the point, and based on the analysis set forth in the Memorandum And Order (Doc. #69), the Court finds that WSU is immune from liability on her state law claim for intentional infliction of emotional distress.[18]

## IV.    Section 1983 Claim Against Dotson (Count IV)

Plaintiff alleges that Dotson denied her equal protection under the Fourteenth Amendment in violation of 42 U.S.C. § 1983 (Count IV). Dotson asserts that he is entitled to qualified immunity on plaintiff's Section 1983 claim because she did not suffer a constitutional injury and Dotson was not deliberately indifferent to her complaints. Plaintiff asserts that a supervisor's complete inaction in the face of known sexual harassment violates the equal protection clause.

The doctrine of qualified immunity protects government officials from individual liability when they act within the scope of their employment. "Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their

---

[18]    If the Court had jurisdiction over plaintiff's outrage claim, it would find as a matter of law that the alleged conduct does not rise to the level of intentional, extreme or outrageous conduct and that plaintiff did not suffer extreme and severe emotional distress. See McGregor v. City of Olathe, Kan., 158 F. Supp.2d 1225, 1242 (D. Kan. 2001) (citing Fusaro v. First Family Mortgage Corp., 257 Kan. 794, 805, 897 P.2d 123, 131 (1995) (to support tort of outrage, conduct must go beyond bounds of decency and "be regarded as atrocious and utterly intolerable in a civilized society")).

conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity provides government officials immunity from suit as well as from liability for their discretionary acts. Mitchell v. Forsyth, 472 U.S. 511, 526-27 (1985); Pueblo Neighborhood Health Ctrs., Inc. v. Losavio, 847 F.2d 642, 644 (10th Cir. 1988).

The Supreme Court has established a two-part approach to determine if qualified immunity applies. "The better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged a deprivation of a constitutional right at all. Normally, it is only then that a court should ask whether the right allegedly implicated was clearly established at the time of the events in question." Tonkovich v. Kan. Bd. of Regents, 159 F.3d 504, 516 (10th Cir. 1998) (citing County of Sacramento v. Lewis, 523 U.S. 833, 842 n.5 (1998)).

Dotson asserts that Perez-Trumbo cannot establish that he deprived her of a constitutional right, and that therefore that he is entitled to qualified immunity.

A.      Deprivation Of Constitutional right

The Tenth Circuit recognizes that sexual harassment under the color of state law violates the equal protection clause. See Woodward v. City of Worland, 977 F.2d 1392 (10th Cir. 1992). A supervisor's knowledge of sexual harassment and complete inaction in the face of an allegation may also constitute a constitutional violation. See Johnson v. Martin, 195 F.3d 1208, 1219-20 (10th Cir. 1999). Perez-Trumbo does not allege that Dotson engaged in sexual harassment, knowingly tolerated it or failed to investigate her complaints. Rather, as noted, she apparently contends that he failed to properly investigate her complaints about Mai because he did not interview one of the witnesses who she described. Plaintiff cannot establish that Dotson ignored her allegations or

violated her constitutional rights.  See id.  Dotson therefore is entitled to qualified immunity on this claim**.**

**IT IS THEREFORE ORDERED** that defendants' <u>Motion For Summary Judgment On Claims Of Shala J. Perez-Trumbo</u> (Doc. #109) filed September 14, 2007 be and hereby is **SUSTAINED**.

Dated this 21st day of December, 2007 at Kansas City, Kansas.

<u>s/Kathryn H. Vratil</u>
KATHRYN H. VRATIL
United States District Judge